MINOR I DOE through parent PARENT I DOE, and Minor II Doe through parent Parent II Doe, Plaintiffs,

v.

SCHOOL BOARD FOR SANTA ROSA COUNTY, FLORIDA; Tim Wyrosdick, in his official capacity as Superintendent of the School District of Santa Rosa County, Florida; H. Frank Lay, in his official capacity as Principal of Pace High School, Defendants.

No. 3:08cv361/MCR/EMT.

United States District Court,
N.D. Florida,
Pensacola Division.

Feb. 19, 2010.

Benjamin James Stevenson, Benjamin Stevenson Esq., Pensacola, FL, Daniel Mach, Heather Weaver, American Civil Liberties Union, Washington, DC, Glenn Michael Katon, ACLU of Florida, Orlando, FL, Maria Kayanan, Randall C. Marshall, ACLU of Florida, Miami, FL, for Plaintiffs.

John David Marsey, Robert Jacob Sniffen, Terry Joseph Harmon, Sniffen Law Firm PA, Tallahassee, FL, Paul R. Green, Johnson Green & Miller PA, Milton, FL, Matthew David Liebenhaut, Christopher Barkas, Carr Allison, Tallahassee, FL, for Defendants.

## ORDER

M. CASEY RODGERS, District Judge.

Pending before the court is a motion to intervene (doc. 127) filed on July 1, 2009, by would-be intervenor Christian Educators Association International ("CEAI"). This case was originally filed in August of 2008 by two high school students against the School Board for Santa Rosa County; its superintendent, now Tim Wyrosdick; and the principal of Pace High School, Frank Lay (collectively, "the School Board"), under 42 U.S.C. § 1983, alleging Establishment Clause violations within the Santa Rosa School District. The case was resolved on admission of liability by the School Board (doc. 44) and the entry of a jointly proposed consent decree (doc. 94) before the pending motion to intervene was filed.[1] The original parties to the suit opposed the motion to intervene on grounds that CEAI lacks standing to inter-

---

1. In light of the fact that this case has been technically closed since the final judgment was entered in May 2009, CEAI's characterization of this as a "preliminary stage" of the proceedings rings a bit hollow.

vene; failed to comply with Federal Rule of Civil Procedure 24(c), which requires that the motion to intervene be accompanied by a pleading; and failed to intervene in a timely manner. (*See* docs. 136, 140.) The court heard oral argument on the motion on September 4, 2009, following which the court required CEAI to file a pleading in intervention. Additionally, the court scheduled an evidentiary hearing limited to the issues of whether CEAI has standing to intervene and whether its motion to intervene was timely filed. CEAI filed its pleading on September 22, 2009 (doc. 178), and the evidentiary hearing was held on December 2–4, 2009. Now, having considered the evidence presented and the arguments of the parties, the court DENIES the motion to intervene.

**Background**

The complaint alleged that the Santa Rosa County School District had a policy and custom of permitting school officials to engage in Establishment Clause violations at school by promoting, endorsing, or causing religious prayers or devotionals during school-sponsored events; planning or promoting religious baccalaureate services at schools; holding school-sponsored events at religious venues when suitable school venues were available; and permitting school officials to promote their personal religious beliefs and proselytize to students in class and during school-sponsored events and extracurricular activities. According to the complaint, these violations were persistent and widespread and included such acts as school-approved prayer and invocations at graduation ceremonies; teacher-led after-school student religious meetings with Bible readings and prayer; teachers and other school officials extolling their faith to students during school-sponsored events and class; teachers assigning religiously oriented school work and encouraging students to attend religious student clubs; a teacher preaching to students before school in the parking lot with the use of a bullhorn; and teachers inviting students to lead prayers before or during sporting events and other school activities. The complaint further alleged that the School Board had actual knowledge of these practices and Establishment Clause violations as early as May 2006, yet violations persisted without remedial action by the School Board.

The School Board admitted liability on December 15, 2008, requested a stay of discovery to reduce costs to the school district, and requested the court to oversee a consent decree. By agreement of the parties, the court entered a temporary injunction on January 9, 2009 (doc. 48), providing immediate relief while the parties worked together to fashion permanent relief in the form of a consent decree. In pertinent part, the temporary injunction enjoined the defendants, all school officials, faculty, and employees, from the following conduct: promoting, advancing, or causing religious prayers or devotionals during school-sponsored events; planning, promoting or sponsoring religious baccalaureate services at schools within the district; holding school-sponsored events at religious venues when alternative venues are reasonably available; promoting personal religious beliefs to students in class or during school-sponsored events and activities; and "[o]therwise unconstitutionally endorsing or coercing religion." (Doc. 48, at 2.)

The School Board was responsible for notifying all school district employees of the temporary injunction prior to its effective date of January 19, 2009. The School Board complied by distributing a copy of the temporary injunction to all faculty and staff prior to that date, requiring a signature to acknowledge receipt of the order, and reading the order aloud to all faculty and staff at a meeting. Additionally, the School Board simultaneously distributed a memo from its attorney, Paul R. Green, setting forth specific guidance for compliance. (*See* Plaintiffs' Ex. 34.) According to the memo, faculty and staff could not give a prayer as part of a school event, whether on school grounds or not; they could be present to supervise after-school activities but could not participate by joining the students in prayer; and generally, they could not lead prayer, pray with students, or discuss personal religious views with students during the school day or at school-sponsored events before or after school. The memo explained that students and teachers alike retained the right to their own religious views, and students retained

the right to express their religious views at school (so long as not facilitated by school personnel), but that school personnel should not express personal religious views at school because as school officials they act on behalf of the state during the course of their employment. The memo directed that all questions about how to proceed in a particular situation be addressed to the School Board's attorney.[2]

The parties worked together to prepare a final consent decree. The School Board discussed the decree at a public meeting on the evening of March 2, 2009. Following the discussion, the School Board voted to approve the consent decree. After the court reviewed the proposal and offered minor technical modifications, the consent decree was filed on May 6, 2009 (doc. 94). In general, the consent decree mirrors the temporary injunction but provides more detail. In relevant part, and consistent with the temporary injunction and the parties' intent, the consent decree permanently enjoins school officials from five categories of activity: (1) sanctioning prayer at school events; (2) planning or organizing religious services or baccalaureate services for schools in the district; (3) holding school events at religious venues when an alternative venue is reasonably suitable; (4) promoting personal religious beliefs of school officials in class or in conjunction with a school event; and (5) taking retaliatory action against the plaintiffs for filing the lawsuit.[3] The final line of the consent decree states, "If this Order does not expressly prohibit conduct, then it is permitted as authorized by law." (Doc. 94, at 9.) On or shortly after May 22, the School Board sent each faculty and staff member a copy of the final

---

2. The temporary injunction was followed by two contempt proceedings, both of which attracted considerable media attention and both of which involved allegations of school personnel giving, or causing another to give, a prayer at a school event contrary to the terms of the temporary injunction. The first of the two incidents involved Michelle Winkler, a school district employee, who was slated to give a prayer as part of the program for the district's Employee of the Year Banquet in late February 2009, but after the temporary injunction issued, she was specifically instructed by School Board administration to give a "thought for the day" instead. In obvious defiance of that instruction, she asked her husband to say the prayer as a "thought for the day" in her place, for which she was reprimanded. According to Linda Novota, who was Winkler's supervisor at the time and a witness at the contempt hearing, Winkler was angry at being reprimanded and refused to sign the written reprimand. Novota also testified that in response to the reprimand, Winkler sharply asserted she had a First Amendment right to say what she wanted to say. After a widely publicized civil contempt hearing was held in August 2009 (initiated by the plaintiffs), the court denied the motion to hold Winkler in contempt, concluding there was no showing by clear and convincing evidence that she had sufficient notice under the language of the temporary injunction that her conduct of having her husband say the prayer at the off-campus, after-hours, ticketed banquet would in fact violate the temporary injunction.

Additionally, a criminal contempt proceeding, which received national media attention, was initiated against the principal of Pace High School, who is a named party to this suit, and the athletic director of Pace High School on allegations that the principal had asked the athletic director to say a blessing prior to a meal at a school event held during the school day in late January 2009, and he complied. After being notified of this conduct by plaintiffs, the court issued a show cause order and provided the constitutional protections afforded through a criminal contempt proceeding, anticipating that the only effective remedy for a completed violation such as this, if proven, would be punitive in nature. See Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911). At the trial, the principal and athletic director both admitted violating the court's order but claimed the violation was not willful. The court ruled that the evidence did not support a finding beyond a reasonable doubt that they had the specific intent to violate the order, which is a necessary element of criminal contempt. See United States v. Bernardine, 237 F.3d 1279, 1282 & n. 2 (11th Cir.2001) (stating the willfulness element of criminal contempt means an intended violation).

In each instance, the School Board had investigated the facts surrounding the violations, met with the employees, and reprimanded them orally and with a letter of warning. The School Board took no other disciplinary action and did not instigate either of the contempt proceedings. The court is not aware of any other disciplinary action taken against an employee regarding the temporary injunction.

3. Additionally, a separate paragraph defines key terms such as "Club," "Prayer," "School Event," and "School Official," and another expressly states that no provision of the consent decree is intended to alter the rights afforded to student clubs by the Equal Access Act, 20 U.S.C. § 4071, et seq.

consent decree accompanied by a letter from the School Board indicating that individuals who violated the order, either intentionally or unintentionally, would be doing so under their own volition and would not represent the desires of the School Board. The letter also informed faculty and staff that they would be subject to discipline including possible dismissal for violations of the order.

On July 1, 2009, CEAI moved to intervene as a defendant in this suit, asserting that the consent decree adversely affects its members' constitutional rights because some provisions can be construed as infringing on their personal-capacity religious speech or conduct. After CEAI filed its pleading in intervention, the plaintiffs moved to strike on several grounds (doc. 182). The court granted the motion to strike, in part, concluding that CEAI lacked standing to vacate the entire consent decree and deciding that, to the extent CEAI could demonstrate standing to represent its members, the proposed intervention would be limited in scope to considering a modification of the consent decree to avoid violation of its members' First Amendment rights. (Doc. 190.)

At the evidentiary hearing on the motion to intervene, CEAI established through its executive director, Finn Laursen, that it is a nonprofit religious association which assists and encourages its members to "live out their faith or to share their faith at school," within legal bounds; the goal of the organization is to help its members understand and exercise their First Amendment rights while at school. Laursen explained that CEAI's membership includes classroom teachers, administrators, and para-professionals in the field of both public and private education. In support of its claims that it has standing to intervene and that it intervened in a timely manner, CEAI presented the testimony of three individuals who were employed by the school district and were members of CEAI at the time it filed its motion to intervene: Vicky Kirsch, a third grade teacher in the Santa Rosa School District; Denise Gibson, a first grade teacher in the Santa Rosa School District; and Michelle Winkler, a clerical administrative assistant for the School Board. Kirsch has been a member of CEAI since 1994, and Gibson and Winkler joined the association in June of 2009.

Kirsch testified that she received the temporary injunction in January 2009 but felt it did not directly impact her because she was not praying with students and it was only "temporary." She received the consent decree and the school district's accompanying memo on May 22, 2009, and testified that she immediately felt the consent decree was an attack on her beliefs. She read the superintendent's letter as an indication she could be dismissed for even an unintentional violation of the consent decree.[4] In response to the consent decree, Kirsch decided on her own to remove a cross from her desk in her classroom (which she admitted was intended to convey the message that she is a Christian) and quit saying "God bless you" or "I'm praying for you" to students and her colleagues during break time. She also felt it was necessary to censor students' work by not reading aloud anything religious from their papers. She quit praying with colleagues at school, even when students were not present. Kirsch expressed concern that she could no longer say a personal blessing or prayer before eating or pray with a colleague at an after-school adult function such as a retirement party, even if held off campus and after school hours. Additionally, Kirsch fears she will not be able to attend or participate in the "See You at the Pole" event[5] in her personal capacity with her

4. As previously noted, the letter actually stated that either an intentional or unintentional violation would not represent the desires of the School Board. A separate sentence informed employees they would be subject to discipline, including possible dismissal for a violation of the order, but it also encouraged employees to seek the advice of a supervisor if there was a question regarding compliance.

5. Kirsch testified that "See You at the Pole" is a community-based religious event where individuals meet together at the flagpole outside of Pace High School once a year toward the beginning of the school year to pray for the upcoming school year. She believed the event was approved by school officials but had never attended. She testified that her grandchildren had never before invited her to attend with them but that her grandson recently said he was planning to invite her to the event next year (in September 2010).

grandchildren, both of whom attend school in Santa Rosa County; will not be able to sit with colleagues at her grandchildren's future baccalaureate services; and will not be allowed to hold her daughter's hand and pray quietly for her grandson if he is injured during a wrestling meet.

Denise Gibson personally received the temporary injunction in January 2009, but testified that she thought because it was "temporary," "it would go away." She testified she first became concerned about her rights when she received the consent decree in late May 2009 and felt it was more restrictive of her rights than the temporary injunctions.[6] The record reflects, however, that she had written an email to Principal Lay and the superintendent in the fall of 2008, shortly after this suit was filed, offering them her support and specifically referencing the lawsuit. She also testified she believed the School Board was "on her side" until she received the consent decree in May. She claims that because of the consent decree she can no longer speak freely with parents or colleagues and must censor any mention of religion from their speech as well as her own. Gibson also feels compelled to censor her first-grade students' work by placing any paper that references religion at the back of the stack and not reading it aloud in class when others are read. Gibson testified that in the past she organized a religious-based support group for fellow teachers and would like to start another such group, which would

meet after hours at the school, but fears it is prohibited by the consent decree.

Michelle Winkler works for the School Board in an administrative staff position and has no interaction with students as part of her duties, although some students are present in the back of the building in which she works. She asserts that she first learned of this lawsuit at the time she received the temporary injunction in January 2009, but an email dated August 28, 2008, from the School Board addressed to her, among others, and entitled "Emergency Preparedness Meeting," referenced the suit. Also, in November 2008, an email exchange between Winkler and her sister includes a reference by Winkler to the "ACLU action."[7] Although Winkler insisted at the hearing she did not appreciate the impact of this case on her rights at the time she received the temporary injunction, she conceded that she was angry and shocked when she read the temporary injunction in January 2009, and also that she defied an instruction by school administration not to offer a prayer at the Employee of the Year Banquet. (See note 2, supra). Winkler nonetheless insisted that it was not until after she read the consent decree in May 2009 that she became afraid she could not pray openly at work.

Winkler testified that she wants to be able to pray openly with colleagues as well as strangers off the street while at work, to freely talk about God, and to pray at after-school events.[8] She testified that she used to

---

Kirsch understood that under the consent decree teachers could attend the event to help supervise but could not participate by joining students in the prayer.

6. However, Gibson admitted during the hearing that she had not read the consent decree in full prior to her deposition testimony in the late fall of 2009, but had only "skimmed" it.

7. During his direct examination of Winkler at the hearing, CEAI's counsel suggested to the court that this email contained no religious content whatsoever. However, the last page of the email, which counsel failed to show Winkler, is unquestionably a prayer. In bold letters, it states, "Lord, Keep your arm around my shoulder and your hand over my mouth ... Amen." (Plaintiffs' Ex. 32.) Following this prayer, the email quotes a Bible verse. While this appears to be a personal email and of no relevance other than to illustrate Winkler's knowledge of the

lawsuit as early as November 2008, counsel, as an officer of the court, should have clarified the misstatement. He instead encouraged Winkler to agree the email had no religious content, which she readily did. Rather than find that counsel intentionally misrepresented the nature of the email, the court will afford counsel the benefit of the doubt and assume he failed to review the entire document prior to introducing it.

8. Winkler also stated the consent decree required her to decline an invitation to speak at a student religious club. However, she had no invitation to speak at any club at the time the motion to intervene was filed, and she had only spoken at two such events in the past ten years. Her current invitation to speak arose out of her contempt proceeding and she was not asked to speak at the club until September 2009. Because she had not been asked to speak at any student-led

pray at work regularly, often with strangers off the street who would come into the building, citing seven such incidences between February 2009 and April 2009, while the temporary injunction was in place. Since receiving the consent decree, Winkler has stopped reading the Bible at work during lunch or breaktime; however, she continues to pray with colleagues, only now they hide in a closet to pray. Winkler said she has removed religious items from her personal work space (two crosses, an angel, a Bible, and a devotional book). She admitted that the School Board's policy does not prohibit her from having a small cross in her personal area or a Bible or devotional book in her drawer, and that the policy does not prohibit her from reading them during break times, but she fears the consent decree prohibits this conduct. Winkler testified she wants to pray continually and concedes she is able to do so silently throughout the work day and still carry out her duties.

According to Kirsch, Gibson, and Winkler, under the consent decree, a "school-sponsored event" occurs any and every time they are present on school premises, regardless of whether it is lunchtime, break time, or even late at night.[9] They all testified (as outlined above) that the consent decree prohibits the conduct they wish to engage in, and they expressed the sentiment that they could not trust the School Board's interpretation of the consent decree, even if more permissive than their own. Each admitted, however, she has never sought the guidance of the School Board's attorney about any of the conduct she now says she wishes to engage in, despite the School Board's offer.

Superintendent Wyrosdick testified that the School Board admitted liability because it was not in compliance with the law. He stressed that the School Board was greatly concerned with preserving the rights of both students and teachers. He said that from the time he was elected in August 2008, when the suit was filed, and continuing throughout the negotiating process, he, the principals, and the administrative staff dealt with numerous questions from school district employees about the lawsuit.[10] He testified that "thousands of conversations were going on in public and private arenas," to which he was privy. He testified that he spoke to hundreds of interested people regarding the teachers' interests and rights and assured the teachers that the School Board was representing their interests. Superintendent Wyrosdick testified that the School Board was distracted from its ordinary business by the volume of questions on the topic and that it spent a great deal of time and money in its effort to respond to the suit, negotiate the ·consent decree, and answer the concerns of faculty, staff, and citizens. Superintendent Wyrosdick stated that the public concern on this issue was such that, "I couldn't go to Walmart without having that conversation with someone I did not know." He also testified he sent notice of the March 2, 2009, School Board meeting to local media and instructed that it be published on the School Board's website. He stated that the meeting was well-publicized, open to the public, and attended by over 100 community members, including clergy, teachers, staff, and former teachers.

Following the issuance of the consent decree, Superintendent Wyrosdick advised faculty and staff to seek assistance from an immediate supervisor if they did not understand what was required under the decree and warned that his office would report violations to the court.[11] Superintendent Wyrosdick also testified that the School Board had a procedure in place to address suspected

club at the time the motion to intervene was filed on July 1, 2009, her decision declining the invitation cannot be used as a basis for standing. "The standing of a prospective intervenor . . . is properly measured at the time intervention is sought in the district court." *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1339 (11th Cir. 2007), *cert. denied,* — U.S. —, 128 S.Ct. 2961, 171 L.Ed.2d 886 (2008).

9. For example, they each expressed the belief that even if they were alone on school premises late at night to use the copy machine, it would be considered a "school-sponsored event."

10. Superintendent Wyrosdick was elected in August 2008 and sworn in officially in November 2008.

11. The School Board has not reported any violations of the consent decree to the court.

violations, which involved a factual inquiry into the details of an alleged violation followed by the School Board's consultation with the School Board's attorney. The School Board then would consider the terms of the consent decree, the advice of counsel, and the particular circumstances at issue before taking any disciplinary action. Superintendent Wyrosdick also testified the School Board went to great lengths to educate faculty and staff regarding their rights and responsibilities under the decree and fielded many questions on the subject.[12] Finally, according to Superintendent Wyrosdick, students view teachers in a supervisory role, even at extracurricular events, and, as such, teachers are expected to enforce the school's code of conduct if necessary at any extracurricular event they attend.

### Discussion

*Standing*

■ "Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims." *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1330 (11th Cir. 2007), *cert. denied*, ⸺ U.S. ⸺, 128 S.Ct. 2961, 171 L.Ed.2d 886 (2008). As a threshold jurisdictional and constitutional matter, standing is an issue the court must consider before addressing the merits of a party's claims. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir.2009). Because standing is an issue of subject matter jurisdiction, "no matter how important the issue, a court lacking jurisdiction is powerless to reach the merits under Article III of the Constitution." *Fleck & Assoc., Inc. v. Phoenix*, 471 F.3d 1100, 1106 n. 4 (9th Cir.2006). *See also Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110, 122 S.Ct. 511, 151 L.Ed.2d 489 (2001) ("[T]he importance of an

issue should not distort the principles that control the exercise of our jurisdiction."). The party invoking federal court jurisdiction bears the burden to establish standing. *See Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); *see also Battle*, 559 F.3d at 1177; *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir.2006). Article III standing requires a showing of (1) a concrete "injury in fact" to a legally protected interest, that is actual and imminent, (2) a causal connection that is "fairly traceable" between the injury and the conduct complained of, and (3) a judicially redressable injury. *See Summers v. Earth Island Inst.*, ⸺ U.S. ⸺, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Standing to sue requires first and foremost a demonstration that the party invoking the court's jurisdiction has "suffered a distinct and palpable injury as a result of the defendant's actions." *Anderson v. City of Alpharetta*, 770 F.2d 1575, 1579 (11th Cir.1985) (dismissing an intervening plaintiff for lack of standing). For a threatened future injury "[t]o be likely enough, [it] must pose a 'realistic danger' and cannot be merely hypothetical or conjectural." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir.2008).

■ An association may have standing in its own right to seek judicial relief from injury to itself, and "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." [13] *Warth*, 422 U.S. at 511, 95

12. In September 2009, the School Board distributed a "Technical Assistance Paper" listing frequently asked questions and answers regarding First Amendment issues and compiled a power point presentation to instruct faculty and staff concerning compliance with the consent decree. (CEAI Ex. 15 & 16.) The power point presentation instructs, among other things, that personal religious items are permitted in an employee's personal space so long as not prominently displayed; students are allowed to express religious beliefs in homework, artwork, or other written or

oral assignments; and teachers are not subject to discipline for permitting student expression in artwork and assignments. Because these exhibits are dated September 2009, after the motion to intervene was filed, they will not be considered in determining when the members knew or should have known of their interests in this litigation.

13. "The modern doctrine of associational standing, under which an organization may sue to redress its members' injuries, even without a

S.Ct. 2197. Representational associational standing has been distilled into a three-part test requiring the association to demonstrate (1) that its members would otherwise have standing to sue in their own right; (2) that the interests the association seeks to protect are germane to its purpose; and (3) that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also Warth*, 422 U.S. at 511, 95 S.Ct. 2197. The first part of the test requires the association to "allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth*, 422 U.S. at 511, 95 S.Ct. 2197.

CEAI does not claim to have standing in its own right but instead seeks to represent the rights of its members.[14] Turning then to the three-part test articulated in *Hunt*, the first question is whether a member of the organization would have standing to sue in her own right. Thus, CEAI must demonstrate that at the time of the motion to intervene was filed Kirsch, Gibson, or Winkler had an injury in fact that is concrete and actual or imminent, causally related to the consent decree, and redressable by a favorable decision. *See Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130; *Am. Civil Liberties Union v. Miami–Dade County*, 557 F.3d 1177, 1190 (11th Cir.), *cert. denied*, —— U.S. ——, 130 S.Ct. 659, —— L.Ed.2d —— (2009). The claimed injury must be "of sufficient immediacy and ripeness," *Warth*, 422 U.S. at 515, 95 S.Ct. 2197, that it can be said to be "certainly impending," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). While one need not "await the consummation of the threatened injury to obtain preventive relief," there must be a "realistic danger of sustaining a direct injury." *Id.*

The claimed injury in this case is that the CEAI members' First Amendment free speech rights have been chilled by the consent decree, resulting in self-censorship of their own religious speech. In the context of a First Amendment challenge, the court is mindful that "the actual injury requirement is most loosely applied in order to provide broad protection for speech." *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir.2009) (internal citation and marks omitted). Acknowledging that the actual injury requirement "is most loosely applied" in this context, however,

---

showing of injury to the association itself, emerges from a trilogy of cases," *United Food and Comm'l Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), beginning with *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. 2197, which squarely recognized an organization's right to bring suit on behalf of its members depending on the nature of the claim and relief sought. The doctrine was refined into a clearly delineated three-part test in *Hunt v. Wash. State Apple Adver.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), and the Court reaffirmed those principles and permitted an association to challenge a pure question of law without the participation of its members in *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–90, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).

**14.** CEAI also reasserts its argument that it has "piggyback" standing on grounds that an attorneys' fee dispute was ongoing at the time the motion to intervene was filed and "a very contentious battle over the enforcement of the Consent Decree" was being litigated at the time it sought to intervene. (Doc. 218, at 10.) The court rejected the argument in a prior order (*see* doc. 190), and CEAI now requests the court to reconsider the issue. The court declines to revisit the issue but reiterates its conclusion: Although piggyback standing may be permitted where "an original party on the intervenor's side remains party to the action and maintains an adversarial litigating position vis-a-vis the opposing parties," *Dillard*, 495 F.3d at 1336–37, no such adversarial conflict existed between the original parties at the time CEAI moved to intervene. A final consent decree had been entered approximately two months prior to that time. CEAI was not attempting to intervene in the outstanding contempt proceeding (which involved a nonparty and not any adversarial conflict between the original parties), and a dispute over attorneys' fees is an insufficient basis on which to establish piggyback standing. *See Diamond v. Charles*, 476 U.S. 54, 70–71, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (holding an intervenor lacked Article III standing to pursue an appeal where the only remaining controversy in the suit was a dispute over attorneys' fees; "[t]he fee award is wholly unrelated to the subject matter of the litigation").

does not render the requirement a nullity—"it still exists." *Id.* The individual claiming a chill on First Amendment speech rights must make an objective claim of chill through a credible threat of penalty for exercising those rights. *Id.; see also Am. Civil Liberties Union v. The Fla. Bar,* 999 F.2d 1486, 1492 n. 13 (11th Cir.1993) (distinguishing this objective standard from the subjective chill on First Amendment freedoms found to be insufficient to meet the constitutional test for standing in *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). A chilling effect that results in self-censorship may satisfy the actual injury requirement of standing where the self-censorship is engaged in to avoid a real threat of enforcement consequences. *Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir.2001); *see also The Fla. Bar,* 999 F.2d at 1492 (stating, in evaluating the nature of the alleged injury, "courts have asked whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure" (internal marks omitted)). "A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir.1998). Thus, in this case, where the alleged injury is one of self-

censorship, the likelihood of disciplinary action by the School Board and/or contempt proceedings before the court are important factors in determining whether the individual reasonably believed it was necessary to forego what she considered to be constitutionally protected speech in order to avoid negative action, and "[t]his inquiry is necessarily case-specific." *Id.; The Fla. Bar,* 999 F.2d at 1492. Where this belief is objectively unreasonable, there is no demonstration of an imminent threat of actual injury. *See Wilson,* 132 F.3d at 1428. For the following reasons, the court finds the asserted self-censorship in this case objectively unreasonable in light of any real potential for discipline or prosecution.

The analysis of whether the members' claim of "chill" is objectively reasonable must begin with a review of what is actually prohibited—i.e., the plain language of the consent decree. The consent decree first defines certain relevant terms and states adherence to the Equal Access Act.[15] Next, under the heading, "Permanent Injunction," the consent decree delineates the scope of prohibited official school conduct in separate paragraphs, three of which are the focus of CEAI's attempt to intervene.[16] The challenged provisions proscribe: (1) prayer[17] by school officials[18] in their official capacity at

---

15. The consent decree states that it is not intended to supplant or alter the rights afforded to student "Clubs" under the Equal Access Act, which guarantees students access to public secondary school premises for meetings regardless of the content of their speech when the school has accepted federal funds and created a limited public forum. *See* 20 U.S.C. § 4071, *et seq.* The consent decree defines "Club" as meaning "a noncurricular student group recognized by the School District and that qualifies through the five, safe-haven provisions (20 U.S.C. § 4071(c)) for protection under the Equal Access Act." (Doc. 94, at 2.)

16. CEAI's members make no claim or factual assertion that their rights are violated by two of the decree's provisions, i.e., that which prohibits school officials from holding school events at a religious venue when a reasonably suitable alternative venue is available or that which forbids school officials from taking retaliatory action against the students who brought this action originally. Accordingly, this order will not address those provisions of the consent decree.

17. "Prayer" is defined in the consent decree as "a *communication with a deity,* including, but not limited to, a devotional, benediction, invocation, the Lord's Prayer, blessing, reading from a sacred text (unless done as part of an authorized curriculum), sermon, or otherwise calling upon a deity to offer guidance, assistance, or a blessing." (Doc. 94, at 2 (emphasis added).)

18. A "School Official" is defined in the consent decree in relevant part as "the Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them in his or her official capacity. If these persons are present at a School Event, then they are present in their official capacity. However, outside organizations that receive no support from the Defendants ... are not School Officials, for example booster clubs when they satisfy these requirements." (Doc. 94, at 3.)

school events;[19] (2) school-sponsored religious services, such as baccalaureate;[20] and (3) school officials promoting their personal religious beliefs to students in class or in conjunction with a school event. Each injunctive provision includes subparagraphs which further delineate its application, and importantly, all provisions refer explicitly to official-capacity conduct, not private conduct. Furthermore, the consent decree plainly states that all "conduct" not expressly prohibited by the consent decree is permitted as authorized by law." (Doc. 94, at 9.)

Common sense as well as basic canons of construction dictate that each paragraph and subparagraph of the consent decree must be read in context. It is a "fundamental principle of ... construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993); *see also Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). Taking a provision in isolation may create ambiguity which is clarified if the whole context or scheme is considered, *see Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004); and a word must be read to fit within the words with which it is closely associated, *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (consistent with common sense, "a word is known by the company it keeps"). Also, considering words in their

context is necessary to avoid a strained or technical reading that might unnecessarily defeat their purpose. *See Kordel v. United States*, 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *see also Koons*, 543 U.S. at 63, 125 S.Ct. 460 ("There is no canon against using common sense in construing laws as saying what they obviously mean." (internal marks omitted)).

Kirsch, Gibson, and Winkler all testified that they feel their constitutionally guaranteed individual speech rights are chilled by the language of the consent decree. Specifically, they fear discipline or contempt proceedings for any mention of religion at school, any act of prayer while on school grounds, and any failure to censor all student or parental speech that might touch on religion. CEAI asserts that these fears and the resulting self-censorship are valid in light of the consent decree and that the speech allegedly chilled is "arguably protected," thus stating a prospective injury to support its claim of standing. After careful consideration, the court cannot agree. As explained below, the members' assertions of fear and self-censorship are based on a misunderstanding and an isolated reading of selected portions of the decree's definitions of "Prayer," "School Official," and "School Event," taken out of context, and further, at least as to some of the conduct the members wish to engage in, they have no arguable constitutionally protected right to engage in such conduct.

The members' interpretation of "Prayer" as encompassing all speech at school that touches on religion is strained beyond the import of the words used in the consent

---

**19.** The term "School Event" is defined in the decree as "any happening sponsored, approved, or supervised by a School Official acting in his or her official capacity. It includes, but is not limited to, a graduation, grade-promotion ceremony, award program, induction ceremony, pep rally, competition, practice, performance, class instructional time, and a club meeting or event. However, a Club meeting or event is not a School Event if all School Officials are present at its meetings and events in a 'nonparticipatory capacity,' as used in the Equal Access Act. Furthermore, when School District facilities are rented to a person or entity that is not a School Official, the event or happening during the rental period and at the rented location shall not be a

School Event if all of the following are true: (1) the rent collected is consistent with the rental rate indiscriminately charged to all rental applicants; (2)the rental time period is not during school hours, and (3) the principal attendees are not School District students." (Doc. 94, at 3.)

**20.** A "Religious Service" is defined in the consent decree to mean "a convocation for a religious reason of any kind, in whole or in part, or religious worship, including, but not limited to, baccalaureate, and includes all aspects of religious observance and practice, as well as belief." (Doc. 94, at 2.)

decree. The consent decree plainly does not ban all religious speech or discourse as prayer. It proscribes only school-sponsored prayer, defined first and foremost as "a communication with a deity." (Doc. 94, at 2.) It then lists several types of prayer, which follow the proviso that prayer includes but is "not limited to" the listed examples. (*See* note 17 *supra*.) The list of examples is therefore not meant to be exclusive or exhaustive but neither does it render the word "prayer" all-encompassing of all religious speech. There is a common aspect among the listed items; each is a form of calling upon or communicating with a deity, and the definition is thereby constrained to include only items similar in kind. *See generally Estate of Wallace v. C.I.R.*, 965 F.2d 1038, 1046–47 (11th Cir.1992) (construing the word "farming" in a statute to exclude the business aspects of farming where the term was illustrated by a list of activities "including" cultivating, raising or harvesting—the court considered the business aspect of farming in this context to be unrelated to the specifically listed examples). If the phrase, "including, but not limited to," meant the provision was "all-encompassing, it is hard to see why it would have needed to include the examples at all." *Begay v. United States*, 553 U.S. 137, 128 S.Ct. 1581, 1585, 170 L.Ed.2d 490 (2008). The listed types of prayer and the general context of the consent decree as a whole prohibit only communication with a deity by a school official at a school event while acting in an official capacity. The members' understanding that "prayer" includes all religious speech runs contrary to the plain language of the decree.

CEAI's members also testified that the consent decree's definitions of "School Official" and "School Event" preclude them from attending a school event in a personal capacity and eviscerate any opportunity for them to engage in private religious speech at school or a school event. Again, CEAI ignores the language and context of the consent decree in favor of an isolated reading. The consent decree defines a "School Official" as a school employee "in his or her official capacity," and

states further that "[i]f these persons are present at a School Event, then they are present in their official capacity." (Doc. 94, at 3.) Read together, this language highlights the parties' intent to proscribe only official-capacity conduct that reasonably can be viewed as school-sponsored conduct; the language understandably recognizes the importance of school officials as role models and a source of authority and discipline at school events.[21] As Superintendent Wyrosdick testified, teachers may be called upon to enforce the school's code of conduct in an official capacity at any time during a voluntarily-attended school event. The definition of "school official" thus recognizes that a school official is always present in an official capacity at school events, but this does not in turn mean that every action a teacher takes or statement she makes at a school event is "official conduct" attributable to the school district.

Ordinary understanding counsels that a school official who is present in his or her official capacity at a school event is not necessarily engaging in official-capacity conduct at all times. Common sense must be employed. Indeed, some common, routinely conducted activities of a school official, such as eating lunch, taking a break, visiting with colleagues, or speaking to a spouse, are performed during the school day or at a school event but cannot be fairly characterized as official-capacity conduct under the consent decree. In the same vein, the quiet prayer of a grandmother (who happens also to be a teacher) out of concern for her grandson if injured at a school event—a scenario proposed by Kirsch—could not be fairly characterized as official-capacity conduct under the text of the consent decree. The consent decree does not ban a school official from all prayer at all times under all circumstances. Context and the character of the school official's conduct will ultimately determine whether a school official is acting in an official capacity and thereby endorsing religion on behalf of the school in any particular situation, and reason and common sense sug-

---

**21.** If anything, it suffers a slight redundancy because the term "school official" itself is defined as an employee "in his or her official capacity," rendering the second sentence somewhat unnecessary, but it does not eliminate private religious speech rights as CEAI suggests.

gest that it is not possible to identify every such situation, hypothesizing about the facts under which it might arise.[22] Importantly, the court also notes that the consent decree's silence regarding personal-capacity conduct is punctuated by its final phrase stating, if the consent decree "does not expressly prohibit conduct, then it is permitted as authorized by law." (Doc. 94, at 9.) In sum, personal, non-officially sanctioned prayer is beyond the realm of what is contemplated by the terms of the consent decree. Thus, CEAI's argument that the consent decree prohibits its members from engaging in lawful religious speech as individual citizens is without merit; the plain language of the consent decree simply does not address the conduct of school employees in any context other than in their official capacity.[23]

Also, CEAI's assertion that the consent decree requires teachers to censor student work or discourage religion has no textual support in the consent decree. The injunction portion of the consent decree provides, in pertinent part, that a school official shall not encourage, authorize, or invite prayer by students or others during or "in conjunction with a School Event;" shall prohibit "non-student third parties" from offering a prayer "in conjunction with a School Event;" and, to the extent a school official permits a person to give an address at a school event and the school official shapes, reviews, or edits the work for content or substance, then the school official must instruct that the address not include a prayer. (Doc. 94, at 4–5.) These provisions apply only to prayer that is part of a school event or "an address" given during a school event; there is no indication they restrict a students' voluntary references to religion in a classroom assignment which does not explicitly solicit a religious response, as Kirsch and Gibson testified. Nor is there

any indication the provisions require a teacher to discourage religion or ostracize a parent who may reference religion during a conference or a conversation, as Gibson testified. Furthermore, nothing in the language of the consent decree requires a teacher to stop a parent attending a school event from praying in his or her personal capacity, as Kirsch testified. Because the consent decree plainly applies only to prayer by school officials acting in their official capacity, CEAI's attempt to characterize the consent decree as prohibiting either personal prayer or all speech that touches on religion urges a strained interpretation by exploiting isolated language beyond reason.

Additionally, and equally as strained an interpretation as that discussed above, Kirsch, Gibson, and Winkler testified that because they are school employees, their every act on school grounds or at any off-campus gathering of school employees is an "approved" "school event;" as such, they believe the consent decree prohibits them from praying even while attending an informal, off-campus gathering such as a fellow teacher's retirement celebration and from mentioning anything religious to anyone while on school grounds, even after hours or on breaks. To the contrary, the consent decree defines "School Event" as "any happening sponsored, approved, or supervised by a School Official acting in his or her official capacity." (Doc. 94, at 3.) The term "School Event" "includes but is not limited to" a list of specific events—i.e., graduations, pep rallies, performances and student club meetings (*see* note 19, *supra*). The listed examples constrain the definition of school event to events that are similar in kind. *See, e.g., Begay*, 128 S.Ct. at 1585 (stating the examples given in a criminal statute limit its reach to cover other crimes similar in kind); *Snapp*

---

**22.** The court cannot stress enough the importance of factual context to the question of whether the conduct of a teacher is "official conduct" proscribed by the consent decree. The list of teacher conduct which may or may not constitute school-sponsored speech depending on the circumstances is a long one and could not possibly be spelled out fully in the consent decree. Only government speech endorsing religion is prohibited by the Establishment Clause, *see Bd. of Educ. of Westside Community Schs. v. Mergens,*

496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), and, rightfully so, this is the sole focus of the consent decree.

**23.** The one exception to this statement is that the consent decree includes one phrase acknowledging that a school official may participate in a religious service in a personal capacity and clarifying that such participation shall not be in an official capacity.

*v. Unlimited Concepts, Inc.*, 208 F.3d 928, 934 (11th Cir.2000) (stating under the principle of *ejusdem generis*, the court interprets a general term "in light of the specific terms that surround it" (internal marks omitted)), *cert. denied*, 532 U.S. 975, 121 S.Ct. 1609, 149 L.Ed.2d 474 (2001). The definition also identifies specific activities deemed outside the realm of a school event.[24] As with the definition of prayer discussed above, the consent decree's plain language demonstrates that the definition of "School Event" is not all-encompassing as CEAI's members fear.

The court notes further and importantly that the School Board has not demonstrated any inclination toward applying an unreasonable interpretation of the plain language of the consent decree."[25] In fact, the School Board has had no occasion to enforce the consent decree; indeed, no employee has been disciplined for violating the order.[26] The School Board agrees that much of what the members complain about not being able to do is permissible under the consent decree (*see* doc. 228), despite the fact that the conduct may occur during the school day when the employee is unquestionably present in an official capacity. *See The Fla. Bar*, 999 F.2d at 1492 (stating, in evaluating the nature of the alleged injury, "courts have asked whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on

enforcing the challenged measure" (internal marks omitted)). It bears repeating that the consent decree explicitly proscribes only conduct by school officials acting within their official capacity to endorse religion or promote prayer at a school event and explicitly permits all conduct authorized by law and not expressly prohibited by the consent decree's terms (doc. 94, at 9).

Again, the difficulty inherent in crafting a consent decree that would comprehensively delineate all scenarios of official-capacity conduct versus personal-capacity conduct is evident in this case. "The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.'" *Lynch v. Donnelly*, 465 U.S. 668, 678, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2125, 29 L.Ed.2d 745 (1971)). For this reason, courts must scrutinize challenges to legislation or official conduct in an attempt "to determine whether, in reality, it establishes a religion or religious faith, or tends to do so." *Id.* The consent decree represents the parties' attempt to remedy the School Board's admitted Establishment Clause vio-

---

**24.** In part, the consent decree's definition of "School Event" specifies that an event held at the school while it is rented out is not a school event if the rent collected is consistent with the rate charged to all applicants, the rental time is not during school hours, and the principal attendees are not school district students. CEAI asserts that this rental provision means the teachers cannot attend a baccalaureate service in their personal capacities because students are the principal attendees. However, all parts of the decree must be given effect. CEAI's argument ignores an explicit paragraph denoting baccalaureate as a religious service and stating that school officials may attend and participate in their personal capacity, but not in an official capacity. (Doc. 94, at 5.) Additionally, any fear that teachers who are friends cannot sit together at a baccalaureate service is unfounded because the consent decree merely prohibits seating that designates them as participating in a religious service "by virtue of their official positions." (Doc. 94, at 5.)

**25.** The prior contempt proceedings that arose out of the temporary injunction do not support

CEAI's members' assertions of fear. The contempt proceedings involved allegations that a school employee or school official—and in one instance, a school official who was a named party to the case—had said a prayer, or caused another to say a prayer, as an official part of a school-sponsored event. That alleged conduct is unrelated in kind to the type of personal conduct that is the basis of the fears articulated by CEAI's members at this hearing. Moreover, in neither instance did the School Board initiate the proceedings.

**26.** CEAI questioned Superintendent Wyrosdick about an incident involving a teacher who wanted to attend a privately held baccalaureate service on school grounds but was concerned about the consent decree. Specific details about the incident are not in the record, but Superintendent Wyrosdick testified that there was much discussion about it, and after evaluating the situation, the teacher was permitted to attend the service.

lations by setting forth guidance for the official conduct of school district employees. It makes no attempt—nor could it—to address every scenario that could possibly arise. It is simply unrealistic to think that one document could delineate every instance of prohibited versus permitted conduct in the First Amendment context.

The court concludes that in light of the plain language of the consent decree and considering the greater weight of the evidence at the hearing, it is objectively unreasonable for CEAI members to claim injury due to First Amendment chill based on their subjective belief they must refrain from all religious speech in any context at school or at informal gatherings such as retirement parties, cannot have small personal religious items in their personal area or a drawer, and cannot attend a baccalaureate service in their personal capacity. Likewise, it is objectively unreasonable for the members to believe the consent decree requires them to censor and exclude all reference to religion from personal conversation with colleagues or parents or to censor students' creative work. Self-censorship on these grounds does not support a claim of injury; the members' imagined or speculative fears of discipline and/or prosecution simply do not support their claims of standing.[27] *See Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301 (noting that to state an injury in the pre-enforcement context the conduct must be arguably constitutionally protected and proscribed by law, and there must exist a credible threat of prosecution); *see also Elend*, 471 F.3d at 1206 (stating the court " 'should not speculate concerning the existence of standing . . . imagine or piece together an injury, . . . [or] embellish[ ] a deficient allegation of injury' " (quoting *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229–30 (11th Cir.2000))).

■■■ The remaining conduct which the members assert has been impermissibly chilled by the consent decree is in fact not arguably constitutionally protected in this context; a school official has no right to

violate the Establishment Clause or to use school facilities for a private purpose absent permission from the school district. The school district has a constitutional obligation to ensure that "subsidized teachers do not inculcate religion." *Lemon v. Kurtzman*, 403 U.S. 602, 619, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Also, school facilities may be deemed public forums for First Amendment purposes only if school authorities have opened the facilities "for indiscriminate use by the general public." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (internal marks omitted). "As with all rights, the scope of the First Amendment has boundaries," *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1271 (11th Cir.2004), and "[t]here is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). However, "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Educ. of Westside Community Schs. v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). Indeed, "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students," neither of whom "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *see also Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (noting courts must "ensure that citizens are not deprived of fundamental rights by virtue of working for the government"). Nonetheless, although "public employees do not surrender all of their First Amendment rights by reason of their employment," a citizen who enters government service must be prepared to

---

**27.** As already noted, the School Board has not interpreted or applied the consent decree to discipline anyone, and the prior contempt proceed-

ings provide no reasonable grounds on which to base a claim of "chill" regarding personal First Amendment rights, see note 25, *supra*.

accept "certain limitations" on this freedom, *Garcetti v. Ceballos*, 547 U.S. 410, 417–18, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), and the Establishment Clause imposes just such a legitimate limitation, *see generally, Holloman*, 370 F.3d at 1284 ("The Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators.") (citing *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). Where, as here, there is an admitted history of Establishment Clause abuses in the school district, the consent decree's remedial injunctive provisions preventing a school official from participating in his or her official capacity in "Prayer" at a "School Event" does not arguably violate the teacher's First Amendment rights. *See Borden v. Sch. Dist. of Township of E. Brunswick*, 523 F.3d 153, 166 (3d Cir.2008) (taking a history of Establishment Clause violations into consideration and finding that a provision prohibiting teacher participation in student-initiated prayer had "numerous valid applications"), *cert. denied*, —— U.S. ——, 129 S.Ct. 1524, 173 L.Ed.2d 656 (2009). Accordingly, the CEAI members in this case, as employees of a

public institution, have no valid claim of First Amendment chill for official-capacity conduct clearly prohibited by the Establishment Clause.[28] *See, e.g., id.* at 171 (holding a teacher had no protected right to participate in student-initiated prayer);[29] *see also May v. Evansville–Vanderburgh Sch. Corp.*, 787 F.2d 1105 (7th Cir.1986) (denying teacher's claim of a First Amendment right to hold prayer meetings on school property before school, explaining, "the workplace is for working and not, unless the employer consents, for holding meetings at which employees can discuss matters of great importance to themselves").[30]

 CEAI argues nevertheless that it has standing to challenge portions of the consent decree as facially overbroad for First Amendment purposes and void for vagueness under the Due Process Clause. The court disagrees. "To establish that a facial challenge to a governmental act presents a real and substantial controversy, a plaintiff must show he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act." *Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale,*

28. CEAI's counsel readily admitted in opening statements at the hearing that CEAI is not seeking "to overturn 50 years of precedent" prohibiting school-sponsored prayer.

29. It is unclear on this record whether the "See You at the Pole" event is a student-led event or a community event or whether students or the community at large are the principal attendees, all important factors in the Establishment Clause analysis and necessary to a proper determination of whether the subjective chill is objectively reasonable. The consent decree prohibits school officials from *participating* in student-led religious activities or clubs at school. *See Mergens*, 496 U.S. at 250, 110 S.Ct. 2356 (noting the Equal Access Act expressly limits participation by school officials at meetings of student religious groups and therefore avoids the problem of a mistaken inference of endorsement). But, the consent decree excludes from the definition of "School Event" those events held by outside organizations that are given no preferential treatment or access where the school facilities are rented consistent with the rate charged to all applicants, the activity is not during school hours, and the students are not the principal attendees—where these circumstances are present, the consent decree does not preclude personal capacity participation of school officials. Because the specifics of the event will

govern whether a teacher, such as Kirsch, would be precluded from participating in the "See You at the Pole" event and those facts are not sufficiently before the court, and because there is no immediacy to Kirsch's representation that her grandson intends in the future to invite her to this event, which she has never attended in the past, the alleged chilling effect as to this event does not support standing. *See Miami–Dade County*, 557 F.3d at 1196 (noting "someday" intentions are inadequate to demonstrate an actual or imminent injury). The doctrine of standing requires the showing of an imminent concrete injury, not a discussion of hypothetical scenarios. *See Elend*, 471 F.3d at 1210 (emphasizing "[c]ontext is critical" in determining whether a there is a "concrete and immediate injury").

30. Gibson testified that she would like to form a religious-based teacher support group at the school but feels that her "right" to do so has been chilled by the consent decree. However, she has no such right to use school property for a private function, except to the extent the school district consents to such use. The school district decides whether and to what extent it will permit its facilities to become a public forum; the First Amendment does not require it to do so. *See Hazelwood Sch. Dist.*, 484 U.S. at 267, 108 S.Ct. 562; *May*, 787 F.2d at 1110–10.

922 F.2d 756, 760 (11th Cir.1991). Neither the overbreadth doctrine nor the void-for-vagueness doctrine relieves a party of the need to demonstrate constitutional standing, including an injury-in-fact. *See KH Outdoor, L.L.C. v. Clay County, Fla.*, 482 F.3d 1299, 1305 (11th Cir.2007) (overbreadth context); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271–72 (11th Cir.2006) (overbreadth context); *see also Zanders v. Swanson*, 573 F.3d 591, 595 n. 3 (8th Cir. 2009) (vagueness context); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir.2006) (vagueness context), *cert. denied*, 549 U.S. 1112, 127 S.Ct. 938, 166 L.Ed.2d 704 (2007). Because CEAI's members have not demonstrated an objectively reasonable imminent injury in fact or threatened injury, CEAI lacks standing to bring either an as-applied challenge or a claim of facial invalidity on grounds of vagueness or overbreadth.[31] For all the foregoing reasons, CEAI cannot meet the first-prong requirement of associational standing.

Although the court's decision on the first prong of the associational standing analysis eliminates any need to consider the matter of standing further, the court nonetheless prefers to address all issues raised by the parties for a complete record. So doing, the court finds that CEAI has established the second prong of associational standing, i.e., that the interests the association seeks to protect are germane to its purpose. *See Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. The testimony of its director, Finn Laursen, sufficiently established the basis for this finding. Nonetheless, CEAI is unable to satisfy the third prong of associational standing, which requires a showing that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* This third prong is prudential in nature rather than a constitutional mandate, yet it nevertheless remains a valuable, albeit "judicially self-imposed[,] limit on the exercise of federal jurisdiction."[32] *United Food and Comm'l Workers Union Local 751*

---

**31.** A facial challenge is "a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application,'" and a proper analysis requires the court to consider only whether the law is vague in all possible applications. *United States v. A Single Family Residence and Real Property*, 803 F.2d 625, 630 (11th Cir.1986) (quoting *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Under the Due Process Clause, a law that is penal in nature must sufficiently inform those subject to it of what conduct will render them liable, and it is facially vague when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *see also Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1329 (11th Cir. 2005) (noting a claimant asserting vagueness must demonstrate that the statute fails to give fair notice of what is prohibited or lacks enforcement standards that could lead to arbitrary or discriminatory enforcement). Because the consent decree at issue here includes express definitions to guide the discretion of the School Board in its interpretation, and those definitions expressly preclude only certain official capacity conduct, any void-for-vagueness challenge regarding personal speech rights would be futile in this instance, even if CEAI had standing to pursue it.

Under the "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008). The overbreadth must be substantial "relative to the statute's plainly legitimate sweep." *Id.* The consent decree clearly has valid applications. In fact, its applications are plainly legitimate because it expressly applies to official capacity conduct and remedies admitted Establishment Clause abuses. Thus, any intervention on this ground would be futile even if standing existed, and any concern about overbreadth may be cured through case-by-case analysis where there is a an actual or imminently threatened alleged injury. *See Borden*, 523 F.3d at 166 ("Not every religious display of a school official will have the necessary history and context to be an Establishment Clause violation, but to the extent this paragraph is overbroad, it is not so substantial as to make the guidelines invalid. Rather, any concern about overbreadth may be cured through case-by-case analysis . . . .").

**32.** In addition to the constitutionally mandated Article III standing requirements, three prudential concerns inform the standing analysis: (1) the claim must fall arguably within the zone of interests to be protected by a statute; (2) the claim must be for an injury to the party's own legal rights and interests; and (3) the injury must be individualized or confined to a discrete group. *Bischoff v. Osceola County, Fla.*, 222 F.3d 874, 883 (11th Cir.2000); *Action Outdoor Adver. JV, L.L.C. v. Town of Shalimar, Fla.*, 377 F.Supp.2d 1178, 1183 (N.D.Fla.2005).

*v. Brown Group, Inc.*, 517 U.S. 544, 558, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Under this prong, associational standing fails where the nature of the claim or relief sought is not common to all members of the association or shared in equal degree, such that "both the fact and extent of injury would require individualized proof." *Warth*, 422 U.S. at 515–16, 95 S.Ct. 2197. An exception exists where an association's claims do not require the consideration of individual circumstances but present only a pure question of law. *See Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–90, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).

As demonstrated by the evidence, the fact-bound nature of CEAI's members' assertions of subjective chill illustrates the problems inherent in permitting the association to intervene in this case on behalf of members who are not themselves participating in the suit. The nature of any claim that the consent decree in fact chills private First Amendment free speech rights is highly dependent on a showing of individual and particularized factual circumstances that are not common to all of CEAI's members or shared in equal degree among them. Unlike *Brock*, 477 U.S. at 287–88, 106 S.Ct. 2523, in which a union was permitted to litigate on behalf of members on a claim involving a pure question of law not dependent on individualized circumstances, the First Amendment claims at issue here are wholly dependent on the particular facts and circumstances of this case. This also destroys CEAI's claim of associational standing.

*Intervention*

 Assuming, arguendo, that CEAI had demonstrated associational standing, the court nonetheless would deny the motion to intervene as untimely. Although the timing of a motion to intervene is not a question of constitutional magnitude, it is nevertheless an important consideration under Rule 24 of the Federal Rules of Civil Procedure, which governs motions to intervene. Rule 24 distinguishes between two types of intervention—intervention as of right under Rule 24(a) and permissive intervention under Rule 24(b)—but both require a "timely motion" to intervene. *See United States v. Jefferson County*, 720 F.2d 1511, 1516 (11th Cir.1983); *see also Nat'l Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 365, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973) ("If it is untimely, intervention must be denied."). The timeliness of the motion is determined from all the circumstances, including: (1) "The length of time during which the would-be intervenor actually kn[e]w or reasonably should have known of his interest in the case before he petitioned for leave to intervene;" (2) the extent of prejudice to existing parties resulting from the failure to seek intervention "as soon as the [the would-be intervenor] actually knew or reasonably should have known of his interest in the case;" (3) "[t]he extent of the prejudice that the would-be intervenor may suffer" if the motion to intervene is denied; and (4) "[t]he existence of unusual circumstances militating either for or against a determination that the [motion] is timely." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir.1977).[33] Additionally, rarely will a motion to intervene be deemed timely where the proposed intervention seeks to undo settlement negotiations that have already culminated in a consent decree. *See generally, Hollywood Community Synagogue, Inc. v. City of Hollywood, Fla.*, 254 Fed.Appx. 769, 771 (11th Cir.2007) (unpublished) (affirming the denial of a motion for intervention as of right as untimely when filed one day prior to the district court's approval of a consent decree and no unusual circumstances justified undoing the settlement negotiations that had culminated in a consent decree); *Del. Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 674 F.2d 970, 974 (3d Cir. 1982) (stating that absent "extraordinary circumstances," there is a presumption to deny intervention after entry of a decree); *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir.) ("Intervention after entry of a consent decree is reserved for exceptional cases."), *cert. denied*, 439 U.S. 837, 99 S.Ct. 123, 58

---

**33.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

L.Ed.2d 134 (1978). With these principles in mind, the court considers the timeliness of CEAI's motion to intervene.

The first *Stallworth* factor requires a determination of the length of time between the point when CEAI actually knew, or reasonably should have known, of its interest in the case and its filing of the motion for leave to intervene. 558 F.2d at 264. The starting point for this inquiry is not when the action was first filed or when the moving party supposedly learned of the pending action, but the point at which the moving party knew or should have known of its interest in the action. *Id.* at 267. CEAI asserts its members should not have known they had a personal interest in the case; that is, that the case might impact their unofficial or personal speech and that the School Board might not represent their interests, until they received a copy of the consent decree on or about May 22, 2009. CEAI, therefore, argues that its July 1, 2009, motion to intervene, less than two months later, was prompt. The court disagrees.

The members disclaim any knowledge of an interest in this case prior to entry of the final consent decree and state they thought the temporary injunction was in fact only "temporary" in nature and did not affect their conduct. The evidence strongly suggests otherwise. It is clear from the evidence that by January 19, 2009, the effective date of the temporary injunction, the members knew, or at a minimum reasonably should have known, of their interest in this lawsuit. They, along with every other school district employee, signed to acknowledge their receipt of the temporary injunction order prior to that date, which informed them in plain and simple language that the School Board had admitted liability on the claims of the suit, the parties had agreed to this tem-

porary injunction, the order applied to the conduct of all School Board employees, and would be replaced by permanent relief in the form of a consent decree, which was being fashioned by the parties. In addition to the order, faculty and staff received a memo from the School Board's attorney providing guidance about the order. According to that memo, the injunction prohibited School Board employees not only from praying with students but also from participating in student prayer or discussing religious views with students during the workday or at school events both before and after school, regardless of whether the school events took place on school grounds. It explained that events such as football games are considered school events. The memo also advised that although students and teachers alike have the right to their own personal religious views, only students have the right to express those views at school because school personnel act on behalf of the state during the course of their employment and therefore are in a different category from students. There was testimony at the hearing that this memo caused concern and generated discussions among the faculty and staff as they struggled to understand how the injunction affected their conduct at school functions both during and after school. The court finds that the preliminary injunction and the School Board attorney's memo gave clear notice from which every School Board employee should have known that his or her interests in religious speech or religious participation at school and during school-sponsored events was at issue in the suit and would be implicated in the forthcoming consent decree.[34]

Moreover, as regards Michelle Winkler, the court has no doubt that she knew she had an interest in this litigation and suspected

**34.** The School Board's open and well-publicized meeting on March 2009, referenced earlier, also provided constructive notice. Superintendent Wyrosdick testified that over 100 community members attended. The content of the proposed consent decree was discussed and voted upon. Regardless of whether the three members who testified in support of intervention had actual notice of this meeting, there is no question that they reasonably should have known of it, and thus of their interest in the suit. *Reeves v. Wilkes,* 754 F.2d 965, 970 (11th Cir.1985) (stating, "informed members of the community had ample opportunity to be apprised of the substance of [the] action," even without formal notice of the formulation or content of the consent decree). Additionally, while "[t]he variety of remedial possibilities in any given case [may] make[] it difficult to foresee which remedies the court or the parties will actually select," *Howard v. McLucas,* 782 F.2d 956, 959 (11th Cir.1986), this obviously was not such a case.

that the School Board might not be adequately representing that interest at the time of the temporary injunction in January 2009. Notably, Winkler's testimony before this court on the issue of knowledge/notice has been inconsistent. At the hearing on the motion to intervene, Winkler testified that when she received the temporary injunction, she did not understand what it meant, she was confused about what was prohibited, she thought the School Board would take care of the lawsuit, and she thought the temporary injunction would "go away." She stated, "My whole thought was our school board was battling against the ACLU and whatever was going on was going to be overturned and nothing was going to matter as far as it [the temporary injunction] was concerned." [35] She claimed to be totally surprised by the terms of the consent decree issued in May. However, in her testimony at the civil contempt hearing before this court in August 2009, Winkler acknowledged that after the temporary injunction was issued and she was instructed by school district officials not to say a prayer at the Employee of the Year Banquet, she felt, "we were in a battle against [the] ACLU and, unfortunately, against our school board because we were robbed of our rights by them as well." (Doc. 171, at 31.) She also explained at the contempt hearing that the School Board's instructions regarding the temporary injunction went beyond what she understood it to prohibit. According to her testimony at that time, the School Board's instructions, which she had received contemporaneously with the temporary injunction in January 2009, "told us basically we couldn't say the word God. We couldn't say prayer. We couldn't talk to anybody. I mean, anything that seemed or looked religious at all, we couldn't do it at anytime, anywhere, on our breaktime, lunchtime, or anything else." (Doc. 171, at 159.) Her supervisor, Linda Novota, testified at the contempt hearing that when reprimanded for having caused her husband to give the prayer at the banquet, Winkler asserted "it

was her First Amendment right to say what she wanted to say." (Doc. 171, at 43.)

Winkler's position at the contempt proceeding that she believed in January and February of 2009 that the School Board was interpreting the temporary injunction in a manner inconsistent with her First Amendment rights, which the court accepted as truthful, stands in stark contrast to her position before the court at the hearing on the motion to intervene, where, incredulously, she claimed that until receiving the consent decree in May, she was unaware of her interest in this suit and thought the School Board would take care of it. Although the prior testimony was not used to impeach Winkler at the hearing on the motion to intervene, the testimony is a matter of public record, and, as the presiding judge over both proceedings, the undersigned cannot overlook this glaring inconsistency or ignore its impact on Winkler's credibility. Such inconsistent positions on an issue so central to the proceeding, i.e., knowledge/notice, significantly detract from the persuasiveness of her present testimony before the court on the motion to intervene. In the end, the court finds that Winkler's blatantly defiant attitude and conduct following her receipt of the temporary injunction and leading up to and at the Employee of the Year Banquet in February (including her email correspondence with a School Board administrative staff member regarding her belief that she had the right to say the prayer, her conduct of asking her husband to say it in her stead, and her anger at being reprimanded (see note 2, supra)), leave no doubt that as early as January 2009, she understood the potential impact of this case on her First Amendment rights and believed the School Board was not representing her asserted interest in engaging in religious speech at school functions, dispelling any notion that CEAI's members did not know of their interest in this suit in January 2009.

---

**35.** Winkler admitted on cross examination, however, that she understood the temporary injunction prohibited prayer at school-sponsored events and that it applied to her. She also testified that when she received the temporary injunction and School Board memo in January, she believed,

"[w]hatever was going on with the lawsuit was causing the School Board to impose some rules on me that seemed ludicrous ... concerning our constitutional rights." Accordingly, Winkler's testimony at the most recent hearing suffered from internal inconsistency as well.

Despite the clear notice provided in the temporary injunction and the School Board attorney's memo, CEAI's members did nothing to protect their interest in the case until approximately two months after the final negotiated consent decree had been entered, which was approximately six months after the members had received and signed for the temporary injunction.[36] *See Brown ex rel. v. O'Neil v. Bush,* 194 Fed.Appx. 879, 882 (11th Cir.2006) (unpublished) (affirming denial of motion to intervene, stating that seven weeks following court-ordered notification of a party's interest in a proposed settlement agreement was not too short a time for an interested party to file a motion to intervene). The court finds that CEAI's members either knew or reasonably should have known of this suit, its nature, and its potential impact on their First Amendment rights at least by January 19, 2009.

The second factor of the timeliness inquiry requires the court to consider the extent of prejudice to the existing parties to the litigation from CEAI's failure to move for intervention as soon as its members actually knew, or reasonably should have known, of their interest(s) in the case. *See Stallworth,* 558 F.2d at 265. The prejudice relevant to this inquiry is "that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he knew or reasonably should have known about his interest in the action." *Id.* Because CEAI's members knew, or reasonably should have known, of their interest by January 19, 2009, the court finds that the existing parties to the litigation would be greatly prejudiced from an attempt to undo or even modify the consent decree at this point. Months of negotiation invested in formulating a remedy to the School Board's Establishment Clause violations would be for naught and substantial additional expense would be incurred by per-

mitting CEAI to force the original parties to restart the process and renegotiate numerous provisions of a consent decree that finalized this litigation four months after its members received notice. *See Jefferson County,* 720 F.2d at 1517 (finding prejudice from not intervening prior to two trials and a long complex negotiation process). Intervention at this point would "upset the delicate balance" already achieved by the parties to the consent decree. *See Cal. Dep't of Toxic Substances Control v. Comm'l Realty Projects, Inc.,* 309 F.3d 1113, 1119 (9th Cir.2002), *cert. dismissed,* 539 U.S. 911, 123 S.Ct. 2267, 156 L.Ed.2d 126 (2003); *Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta,* 224 F.R.D. 694, 700 (N.D.Ga.2004).

The third timeliness factor is the extent of prejudice that CEAI would suffer if its motion to intervene is denied, and the court finds there is little. *See Stallworth,* 558 F.2d at 265. Contrary to CEAI's assertion otherwise, the School Board adequately represented the interests of its employees by carefully drafting the consent decree to restrict only official-capacity speech or conduct.[37] Where, as here, the movant's interests were adequately represented, no prejudice exists. *See Jefferson County,* 720 F.2d at 1517. CEAI alleges prejudice because its members' individual constitutional rights will be in jeopardy and it will be forced to challenge the consent decree in a separate lawsuit if not permitted to intervene, resulting in additional delay, expense, and the necessity of mounting a legally difficult collateral challenge to a final order. This may be true; however, "[t]he burdens of cost and delay the would-be intervenor would suffer if required to bring a future lawsuit do not constitute prejudice under the third *Stallworth* factor," because those costs would exist any time the movant sought to enforce his rights in court. *Id.* at 1517 n. 13.

---

**36.** Kirsch was a member of CEAI at the time she received the temporary injunction, clearly providing CEAI with constructive notice, and CEAI is also appropriately charged with constructive notice through the knowledge of Gibson and Winkler, on whose behalf if seeks to intervene.

**37.** Also, even assuming the members' interests had not been represented adequately by an existing party to the litigation, the court finds they

could nonetheless institute an independent lawsuit to assert specific violations of their rights. *See Reeves,* 754 F.2d at 971 (finding denial of intervention did not prejudice the would-be intervenor under the third *Stallworth* factor, because one who is not adequately represented by an existing party and whose civil rights are impacted by a consent decree may bring an independent action to assert those rights).

Under the fourth timeliness factor, the court should consider whether unusual circumstances exist, militating either in favor of or against a finding of timeliness. *Stallworth*, 558 F.2d at 266. The court finds that this case presents unusual circumstances militating against a finding of timeliness. From the outset, this lawsuit has been a polarizing force in the community. Rarely, if ever, has the undersigned seen the type of intense public debate surrounding a lawsuit that this case has generated, debate which has been carried out not only in the schools but in the media, on billboards, in churches, and on the streets. Teachers, students, parents, clergy, attorneys, legislators and community members alike have voiced an opinion on this case, many of whom have been placed at loggerheads over its subject matter.[38] Additionally, although the case presumably has been a financial burden on all parties, the court notes that for the School Board, a local governmental body primarily dependent on public tax revenues for support, the burden has been extraordinary, with the costs extending well beyond ordinary legal expenses. For example, Superintendent Wyrosdick testified at the hearing, that since the filing of the complaint in August 2008, School Board administration has spent an enormous amount of time answering endless questions about the suit (so many, in fact, that his office prepared and disseminated a technical assistance paper and an entire power-point presentation based on the frequently asked questions) and educating faculty and staff regarding compliance. Wyrosdick testified that he could not walk through a store without being peppered with questions on the subject. He also testified that the School Board itself was inundated with questions and public comment. Thus, there can be little doubt that the School Board members themselves, faculty, staff, and students of the district at various times have been consumed by the controversy sparked by this case. In short, to say this case has been a significant distraction to the effective operation of the Santa Rosa County school system for the past year-and-a-half is a considerable understatement. To re-open the case at this point for further litigation over the consent decree would mean only more distraction and increased public expense. Considering these factors in light of the delayed timing of the motion to intervene, the court finds the prospect of intervention at this late date especially burdensome. The court is simply unwilling to undo the months of negotiation that culminated in the parties' final consent decree at the expense of the parties to this case and the public.[39]

Having considered the *Stallworth* four-part test of timeliness, the court finds in its discretion that the motion to intervene must be denied as untimely. Therefore, there is no reason to consider whether CEAI satisfied the remaining factors relevant to intervention under either Rule 24(a) or Rule 24(b).

## Conclusion

CEAI lacks standing to intervene because it has not demonstrated that the consent decree results in an objectively reasonable "chill" on its members' First Amendment rights. Alternatively, CEAI's motion to intervene is untimely. Accordingly, CEAI's motion to intervene (doc. 127) is DENIED.[40]

---

**38.** In the local newspaper alone, there have been dozens of articles, which in turn generated countless letters to the editor on a daily basis for months.

**39.** Another factor mitigating against the motion is the general principle that "[p]ost-judgment intervention is rare." *Edwards v. City of Houston*, 78 F.3d 983, 1001 (5th Cir.1996); *United States by Bell on Behalf of Marshall v. Allegheny–Ludlum Indus.*, 553 F.2d 451, 453 (5th Cir.1977) (*see Bonner*, 661 F.2d at 1209), *cert. denied*, 435

U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). In this case, "extraordinary circumstances" do not exist to justify permitting intervention after the entry of the final consent decree. *See Del. Valley Citizens' Council for Clean Air*, 674 F.2d at 974.

**40.** Because CEAI is not a party and this order denies a motion to intervene, rather than entering a judgment, plaintiffs' counsel's oral motion for judgment as a matter of law pursuant to Rule 50(a) at the hearing was procedurally incorrect.

The clerk shall terminate the motion (doc. 222) on the docket.