[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 6, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10705

_____

D. C. Docket No. 03-01657-CV-T-23-TGW

ADAM ELEND,
JEFF MARKS,
JOE REDNER,

                                        Plaintiffs-Appellants,

versus

W. RALPH BASHAM, in his official capacity as
Director of the U.S. Secret Service,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(December 6, 2006)**

Before CARNES and MARCUS, Circuit Judges, and JORDAN,[*] District Judge.

MARCUS, Circuit Judge:

_____

[*]Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

At issue today is whether the district court erred in dismissing a First Amendment claim for declaratory and injunctive relief on standing and ripeness grounds. After thorough review, we affirm because the requested relief concerns wholly prospective conduct for which the details of time, location, audience, and the nature of the protest activity are utterly lacking. Quite simply, this case is not justiciable.

## I.

The basic facts and procedural history are straightforward. Plaintiffs Adam Elend, Jeff Marks, and Joe Redner allege that their First Amendment rights were violated on November 2, 2002, when they attempted to protest at a political rally attended by President Bush at the University of South Florida (USF) Sun Dome.

Marks and Redner held up placards,[1] while Elend videotaped the event and distributed copies of certain Supreme Court decisions pertaining to the First Amendment. Plaintiffs began to conduct this activity on a median adjacent to a

---

[1] The placards contained the following three messages:

> "Freedom of expression would not truly exist if the right could only be exercised in an area that a benevolent government has provided as a safe haven for crackpots." Tinker v. DesMoines, 393 U.S. 503 [sic]

> "Why do you let these crooks fool you?"

> "War is good for business. Invest your sons."

parking lot on the USF campus, approximately 150 feet from the nearest Sun Dome entrance and 30 feet from event attendees who were waiting in line. Soon after the commencement of this activity, USF police officers told the Plaintiffs that they would have to stand in the "First Amendment zone," an area estimated to be one quarter of a mile away from the Sun Dome. The "protest zone" consisted of a metal fence patrolled by law enforcement personnel, some of whom were on horseback. Plaintiffs contend that others carrying placards and signs indicating support of President George Bush or Governor Jeb Bush were not asked to move to the protest zone.

Plaintiffs explained to USF officers their belief that the creation of such a zone unconstitutionally restricted their freedom of speech. At that point, they were approached by a purported agent of the Sun Dome, Kelly Hickman, who also requested they move to the protest zone. When Plaintiffs refused to relocate, Hillsborough County Sheriff's deputies arrested them for "trespass after warning," Fla. Stat. § 810.09 (2006). Plaintiffs were released and the charges dropped after it was determined that no agent of the Sun Dome had the requisite authority to provide a warning, as required by state trespass law.[2]

---

[2] To be convicted under § 810.09(b) of the Florida penal code, an offender must defy an "order to leave, personally communicated to the offender by the owner of the premises or by an authorized person. . . ."

3

Invoking federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343, Plaintiffs commenced this lawsuit in the United States District Court in the Middle District of Florida in August 2003. The named defendants were Sun Dome, Inc.; the USF Board of Trustees, "in their representative capacity" for USF; W. Ralph Basham in his official capacity as Director of the U.S. Secret Service [hereinafter "Secret Service"]; and Cal Henderson, the Sheriff of Hillsborough County in his official capacity. Plaintiffs sought damages against Sun Dome and USF, through 42 U.S.C. §§ 1983, 1985, and 1988, for violations of their First and Fourteenth Amendment rights. Plaintiffs also sought declaratory relief for the allegedly unconstitutional "acts, practices, and customs" of defendants and an injunction against "any further constitutional violations." Their claims against the Secret Service were made pursuant to 5 U.S.C. § 702, which removes governmental immunity from suits seeking declaratory or injunctive relief against federal agencies or employees acting in their official capacity. Notably, Plaintiffs did not seek any monetary damages from the Secret Service.

Soon thereafter, the Secret Service moved to dismiss the claim for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, and, in July 2004, the district court granted the motion because the complaint failed to "allege that the plaintiffs desire to engage further in the type of

activities that are the subject of this action." Plaintiffs then filed a second verified amended complaint in response to the district court's observation that the first complaint did not contain specific allegations of future injury. In the amended complaint, Plaintiffs alleged that they "fully intend to peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002 in concert with presidential appearances at the USF Sun Dome and at other locations around the country." Verified Second Amended Complaint, para. 46. The complaint contained no further explication of the time, location, audience, or nature of protest activity contemplated.

The Secret Service again moved to dismiss on justiciability grounds. Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the district court again dismissed Plaintiffs' claims against the Secret Service on May 18, 2005, holding that Plaintiffs' claims that they would protest in a similar manner in the future were too speculative to satisfy the requirements of both standing and ripeness. The court reasoned that the Plaintiffs could wait until it became known when and where they would protest before seeking declaratory and injunctive relief.

On August 24, 2005, Plaintiffs sought leave to amend the complaint still again in order to add the Hillsborough County Sheriff's Department and individual

employees, the USF Police Department and individual employees, and Sun Dome employees "who actively participated in the incident." Sun Dome and USF moved for summary judgment on the claims against them. The district court granted summary judgment for the remaining defendants Sun Dome and USF on the basis of Eleventh Amendment immunity because they were state actors and because of the lack of evidence that Sun Dome had any policy or custom that violated the First Amendment. The district court also determined the claims against Sun Dome and USF to be nonjusticiable, again on standing and ripeness grounds. Finally, the district court denied Plaintiffs' motion for leave to amend because it was untimely, having been filed after the scheduling order deadline had passed and because no good cause was shown.

Plaintiffs filed a timely notice of appeal, urging that 1) the district court erred in dismissing the Secret Service as a defendant on justiciability grounds, and 2) the district court also erred in denying Plaintiffs' motion for leave to file an additional amended complaint. Subsequent to the filing of the notice of appeal, Plaintiffs, Sun Dome, and the USF Board of Trustees agreed to the voluntary dismissal of the appeal as to all other appellees, leaving the Secret Service as the sole appellee and only the first issue for us to resolve.

**II.**

We review de novo questions concerning our subject matter jurisdiction, including standing and ripeness. See Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA, 386 F.3d 1070, 1082 (11th Cir. 2004); London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1251 (11th Cir. 2003).

Standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute. See Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005) ("In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims."); Nat'l Adver. Co. v. City of Miami, 402 F.3d 1335, 1339 (11th Cir. 2005) ("Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes."). Both standing and ripeness originate from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies. Flast v. Cohen, 392 U.S. 83, 94-101 (1968) (discussing the origins of the standing doctrine); Abbott Labs. v. Gardner, 387 U.S. 136, 148-149 (1967) (discussing the origins of the ripeness doctrine). This jurisdictional limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." Allen v. Wright, 468 U.S. 737, 750 (1984); see also Socialist Workers Party v. Leahy, 145

7

F.3d 1240, 1244 (11th Cir. 1998).

This case presents an instance of the doctrinal overlap between standing and ripeness analysis. "Few courts draw meaningful distinctions between the two doctrines; hence, this aspect of justiciability is one of the most confused areas of the law." Wilderness Soc'y v. Alcock, 83 F.3d 386, 389-90 (11th Cir. 1996). The distinction traditionally made, however, is that standing deals with which party can appropriately bring suit, while ripeness relates to the timing of the suit. See id. at 390. Thus, there may be standing without ripeness, as when a party alleges a concrete injury but has not exhausted prescribed administrative remedies, see, e.g., Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938); or there may be ripeness without standing, as when an injury is fully formed, but the remedy sought would simply not redress the harm, see, e.g., Linda R. S. v. Richard D., 410 U.S. 614, 617-18 (1973). There may also be ripeness without standing when an injury is fully formed but the plaintiff simply asserts the claims of third parties. See, e.g., Whitmore v. Arkansas, 495 U.S. 149, 151 (1990). But in cases involving pre-enforcement review, the standing and ripeness inquiries may tend to converge. See, e.g., Socialist Workers Party, 145 F.3d at 1244-1245; ACLU v. Fla. Bar, 999 F.2d 1486, 1490 (11th Cir. 1993). This is because claims for pre-enforcement review involve the possibility of wholly prospective future injury, not

8

a prayer for relief from damages already sustained.

It is by now axiomatic that standing requires the plaintiff to demonstrate injury in fact, causation, and redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). It is the first element, injury in fact, that most often converges with ripeness. If an action for prospective relief is not ripe because the factual predicate for the injury has not fully materialized, then it generally will not contain a concrete injury requisite for standing. In this case the Plaintiffs' suit against the Secret Service establishes neither standing nor ripeness.

Despite the conspicuous overlap of the two doctrines, we discuss standing and ripeness separately. But whether this case is examined through the prism of standing or ripeness, it can be distilled to a single question: whether the Plaintiffs have sufficiently alleged an imminent and concrete threat of future injury by stating their intention to protest at an unspecified, prospective event supervised by the Secret Service? The answer is plainly in the negative.

A.

The standing inquiry "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen, 468 U.S. at 752; Warth v. Seldin, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant

9

clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). It is not enough that "the [plaintiff]'s complaint sets forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements." Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1229 (11th Cir. 2000) (citations omitted). Indeed, "we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none. . . . If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." Id. at 1229-30.

From these principles flow the two strands of standing analysis: a court must take into account "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth, 422 U.S. at 498 (citing Barrows v. Jackson, 346 U.S. 249, 255-56 (1953)). The prudential requirements for standing -- that a plaintiff cannot raise the claims of third parties; cannot claim standing based on a generalized grievance; and must raise a claim within the zone of interest covered by a statutory conferral of standing, Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1203-10 (11th Cir. 1991) -- are not in dispute in this case. The constitutional requirements of standing are that "[1]

10

the plaintiff must have suffered an 'injury in fact' . . . . [2] there must be a causal connection between the injury and the conduct complained of . . . . and [3] it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 560-61 (citing Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38, 41-43 (1976)). The plaintiff bears the burden of establishing each of these elements. See Bennett v. Spear, 520 U.S. 154, 167-68 (1997). Here, the causation requirement is satisfied because Plaintiffs' alleged First Amendment injury is fairly traceable to the purported Secret Service practice or policy. As for the requirements of injury and redressability, however, Plaintiffs' complaint is undeniably deficient.

In their complaint, Plaintiffs allege that the "Secret Service [has] previously instituted a policy and practice of forcing 'demonstrators' or selected political speakers (specifically selected on the basis of the content of their message) to constrain themselves to other 'Protest Zones,'" which "have been widely utilized as a reflection of their custom and practice of implementing constitutionally impermissible restrictions on protected political speech at virtually every domestic presidential appearance." Putting aside whether such a policy actually exists, we examine whether Plaintiffs' claimed future injury is imminent and concrete enough for judicial consideration. As we have noted already, the Plaintiffs failed

11

to characterize their future injury in any way, other than to say at the highest order of abstraction that they "fully intend to peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002 in concert with presidential appearances at the USF Sun Dome and at other locations around the country." Given the entirely speculative inquiry of whether Plaintiffs will protest again and -- even assuming that such a protest will take place -- the unspecified details of where, at what type of event, with what number of people, and posing what kind of security risk, we are being asked to perform the judicial equivalent of shooting blanks in the night. Consistent with our obligation to adjudicate only a live case or controversy, we refuse to pull the trigger.

A plaintiff is deemed to have suffered an injury in fact -- "an invasion of a judicially cognizable interest" -- when he demonstrates a harm that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." 31 Foster Children v. Bush, 329 F.3d 1255, 1263 (11th Cir. 2003).

Plaintiffs' complaint can be separated into two purported injuries. First, the protest zone was allegedly located at a distance too far from the event itself for Plaintiffs to effectively exercise their First Amendment rights. Second, the Plaintiffs claimed they were discriminated against based on the content of their

12

message[3] by being sent to a special protest zone while others with signs favorable to President Bush were not treated similarly.

The content-based discrimination alleged, if true, could constitute a breach of First Amendment protections. "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." Eu v. San Francisco Cty. Democratic Central Comm., 489 U.S. 214, 223 (1989) (internal quotation marks omitted). For elections to occur with due respect for the democratic process, competing political views cannot be asphyxiated by locating their expression at a distance so far as to render them meaningless, or by treating one viewpoint less favorably than another.

But a prayer for injunctive and declaratory relief requires an assessment, at this stage in the proceeding, of whether the plaintiff has sufficiently shown a real and immediate threat of future harm. See City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983) (where a plaintiff seeks prospective relief, he must demonstrate a "real and immediate threat" of future injury); Cone Corp., 921 F.2d at 1203

---

[3] Although Plaintiffs characterize their injury as content-based discrimination, the facts they allege may more aptly be described as viewpoint-based discrimination. Plaintiffs contend they were treated differently based on expressing disapproval of the President, not based on expressing any political message at all. But in truth, it makes little practical difference here whether the First Amendment claims are labeled content-based or viewpoint-based since analytically both are treated using strict scrutiny. Burson v. Freeman, 504 U.S. 191, 197 (1992) (plurality opinion) ("The First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic."). Regardless, we cannot reach the merits of the claim.

13

(same); Johnson v. Bd. of Regents, 263 F.3d 1234, 1265 (11th Cir. 2001) (same); Wooden v. Bd. of Regents, 247 F.3d 1262, 1284 (11th Cir. 2001) (same). The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent. See 31 Foster Children, 329 F.3d at 1266-67 (noting that standing for declaratory or injunctive relief requires that future injury "proceed with a high degree of immediacy"); Bowen v. First Family Fin. Servs., 233 F.3d 1331, 1340 (11th Cir. 2000) (observing that a "perhaps or maybe chance" of an injury occurring is not enough for standing). Because of the inquiry's focus on wholly prospective conduct, it follows that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." Lyons, 461 U.S. at 102 (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)).

Viewed in this light, the Plaintiffs' allegations are insufficient. When standing is questioned at the pleading stage, as it is here, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561 (citations and internal marks omitted). We accept as true all material allegations contained in the

14

complaint and construe the complaint in a light most favorable to the complaining party. Warth, 422 U.S. at 501. Moreover, in the context of a Rule 12(b)(1) challenge to standing, "we are obliged to consider not only the pleadings, but to examine the record as a whole to determine whether we are empowered to adjudicate the matter at hand." Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003).

The barest examination of several leading standing cases in this circuit illustrates the pleading deficiencies in this complaint. Where we have found a sufficient imminence of future harm based on a past injury, the plaintiff has alleged with particularity that a future injury would likely occur in substantially the same manner as the previous injury. Thus, for example, in 31 Foster Children, 329 F.3d at 1267, a panel of this Court found standing for children who actually were in the custody of the foster care system involuntarily, but no standing for children who had run away and were no longer in the defendants' physical custody because the prospect of their returning to foster care was too speculative. In Lynch v. Baxley, 744 F.2d 1452 (11th Cir. 1984), a mentally ill plaintiff, not incarcerated at the time of the suit, sought to enjoin the state from detaining individuals in county jails pending civil commitment hearings. He was found to have standing because the court believed his mental problems were sufficiently

15

likely to recur and that "there [was] every indication that [he] could continue to be the subject of [future] involuntary commitment petitions." Id. at 1456. Plaintiff was "at risk of being detained in jail not because of volitional acts on his part but because his mental condition would prompt his family, as it [had] done on two previous occasions, to petition for involuntary commitment." Id. at 1457 n.7. And in Church v. City of Huntsville, 30 F.3d 1332, 1339 (11th Cir. 1994), plaintiffs had standing to pursue a preliminary injunction, which would enjoin the City of Huntsville from arresting, harassing, or removing the plaintiffs because of their homeless status. Pleading a complaint for prospective relief does not require oracular vision -- this Court did not know exactly when the plaintiff in Lynch would be incarcerated again or when the plaintiffs in Church would be harassed in the future. But the claims in those cases indicated a credible threat that the injury would be repeated imminently to justify declaratory or injunctive relief.

Even the precedents that Plaintiffs rely on -- Bischoff v. Osceola County, 222 F.3d 874 (11th Cir. 2000) and Florida Public Interest Research Group Citizens Lobby v. EPA, 386 F.3d 1070 (11th Cir. 2004) ("Florida PIRG") -- are inapposite. In Bischoff, the district court raised the issue of standing sua sponte in response to the parties' cross motions for summary judgment. The plaintiffs unambiguously alleged that they were told by officers to stop distributing handbills at a clearly

16

identified intersection, that they were threatened with arrest and their colleagues were in fact arrested at that precise location, and that they intended to return to the same spot to continue handbilling. Bischoff, 222 F.3d at 877.

Florida PIRG is even less on point because it involved a concrete, ongoing injury. In that case, the plaintiffs alleged an injury involving their loss of enjoyment of Florida's waters because of overpollution. "[P]laintiffs have provided detailed affidavits averring how they are particularly injured by the EPA's failure . . . ." Florida PIRG, 386 F.3d at 1083. The injury for the plaintiffs in Florida PIRG began when the waters became overpolluted and would not cease until the water quality improved, allowing them to resume the activities on the water that they had engaged in before.

In sharp contrast, the injury alleged in this case remains wholly inchoate. Unlike in Bischoff, where it was known exactly where the activists intended to demonstrate and precisely which local ordinance was invoked to stop them, Plaintiffs' intention in this case to protest "in concert with presidential appearances at the USF Sun Dome and at other locations around the country" fails to provide any limitation on the universe of possibilities of when or where or how such a protest might occur. Other than the one instance in November 2002, we are not even given a description of Plaintiffs' past conduct from which to infer that

17

they might act in a similar manner in the future.  See Lynch, 744 F.2d at 1456 ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.").

Moreover, it is entirely conjectural that President Bush would return to speak at a political rally at the Sun Dome.  In fact, we have no indication that he has done so again since November 2002 despite numerous presidential visits to Florida.  Nor is it even remotely permissible to presume future injury from Plaintiffs' intention to protest "at other locations around the country."  To find that this somehow constitutes "real and immediate" injury sufficient to confer standing would eviscerate the meaning of both words.

Indeed, the Plaintiffs' avowed intention to protest in a similar manner in the future is akin to the plaintiff in Lujan who declared, "I intend to go back to Sri Lanka [to observe endangered species]," but confessed that she had no current plans: "I don't know [when]."  Lujan, 504 U.S. at 564. "Such 'some day' intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support a finding of the 'actual or imminent' injury that our cases require."  Id.  In the four years since Plaintiffs' alleged First Amendment violation, they have not asserted that they protested President Bush at

18

the Sun Dome or any other venue, for that matter. The entirely speculative nature of the "future protests" would render wholly advisory any prospective relief.

B.

Plaintiffs also fail the standing requirements because the putative injury lacks redressability. First, the inchoate nature of the claim provides an insurmountable obstacle for a court to fashion an injunction that accomplishes anything beyond abstractly commanding the Secret Service to obey the First Amendment. It is well-established in this circuit that an injunction demanding that a party do nothing more specific than "obey the law" is impermissible. See Burton v. City of Belle Glade, 178 F.3d 1175, 1201 (11th Cir. 1999) ("As this injunction would do no more than instruct the City to 'obey the law,' we believe that it would not satisfy the specificity requirements of [Federal Rule of Civil Procedure] 65(d) and that it would be incapable of enforcement."). This would be the case if we accepted Plaintiffs' suggestion, made during a hearing before the district court, that one possible injunction could read: "the Secret Service shall ensure there's no violation of the First Amendment." Such an injunction would merely command the Secret Service to obey the law. Nor would it be plausible for a court to craft an injunction saying, for example, that a protest zone must be located no farther than 50 feet or 100 feet from an event entrance. A one-size-fits-all injunction would

19

serve no one's interests because, depending on the circumstances, it still could unconstitutionally muffle expression while at the same time compromising the security of the President.

Second, promulgating an order in the face of such overwhelming ambiguity would amount to an abdication of our duty to only adjudicate actual cases or controversies.  A proper deference to the Constitution's separation of powers means that a court may only reach the merits of those cases that present concrete and immediate injury.  It seems to us self-evident that a court would be unable to conduct the First Amendment analysis required without knowing anything more than vague generalities about future protests.  Assuming that Plaintiffs were in fact subject to content-based discrimination during their protest based on a Secret Service policy, that policy would be reviewed using strict scrutiny.  See Burson v. Freeman, 504 U.S. 191, 197-98 (1992) (plurality opinion).  Undeniably, strict scrutiny analysis requires a court to examine the context of the claim to determine if the government policy is necessary to serve a compelling interest in proscribing such speech and if the regulation is narrowly tailored to serve the purported government interest. See id. at 198; accord Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 573 (1987); Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 800 (1985); United States v. Grace,

20

461 U.S. 171, 177 (1983). At times this will require the court to weigh "truly difficult issues involving the First Amendment," Burson, 504 U.S. at 198, in deciding whether a regulation contravenes the Constitution. Context is critical. What is necessary to enable the Secret Service to provide adequate security at any event will vary based on the size of the audience; the existence of any threat; the kind of venue; and the type of event -- all things which Plaintiffs have not alleged with any particularity. Cases cannot be decided in a vacuum. At a bare minimum, standing requires that a plaintiff provide a concrete frame of reference for evaluating an alleged future harm.

To be clear, our ruling today does not set the bar insuperably high for prospective relief. We have recognized before that "[t]he injury requirement is most loosely applied -- particularly in terms of how directly the injury must result from the challenged governmental action -- where first amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir. 1991). But for a case to be entitled to an adjudication on the merits, there must be a substantial indication that the injury will occur and, if so, what shape that injury may take. We are provided neither.

21

## III.

The ripeness problem in this case is much the same as standing. In essence, this doctrine deals with when a party can seek pre-enforcement review: "whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court." Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997) (quoting Cheffer v. Reno, 55 F.3d 1517, 1524 (11th Cir.1995)). Ripeness analysis involves the evaluation of two factors: the hardship that a plaintiff might suffer without court redress and the fitness of the case for judicial decision. Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).

Hardship can sometimes be established if a plaintiff demonstrates that he would have to choose between violating an allegedly unconstitutional statute or regulation and risking criminal or severe civil sanctions. See Steffel v. Thompson, 415 U.S. 452, 462 (1974) (holding, in a case where prosecution was threatened but not pending, that to require arrest before issuing declaratory relief would place "the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding"). In such a case,

however, plaintiffs must still demonstrate a "credible threat of prosecution." Babbitt v. UFW Nat'l Union, 442 U.S. 289, 298 (1979). In Steffel, the Court noted that there was a credible threat of prosecution because the plaintiff had twice been warned that he could be arrested for handbilling outside a mall and his handbilling companion was in fact arrested. Steffel, 415 U.S. at 459.

In this case, however, it would strain credulity to say that there is a credible threat that Plaintiffs' First Amendment rights will be violated in the future. Again, we don't know when they will protest, we don't know where they will protest, and we don't know how they will protest.

The injunctive and declaratory relief sought for the allegedly unconstitutional protest zones would seem especially unfit for judicial decision on ripeness grounds too, because, as we have noted already, that analysis depends so critically on the location and circumstances of the protest zone. Cf. Cal. Bankers Assoc. v. Schultz, 416 U.S. 21, 56 (1974) ("This Court, in the absence of a concrete fact situation in which competing associational and governmental interests can be weighed, is simply not in a position to determine whether an effort to compel disclosure of such records would or would not be barred . . . ."). See also United Pub. Workers v. Mitchell, 330 U.S. 75 (1947).

In saying that Plaintiffs lack standing and ripeness to prosecute their claims

today, we do not blithely discard the First Amendment rights that underpin their claims. The opportunity to petition the President of the United States or other high-ranking government officials for redress of grievances has long served as a bedrock right enshrined in the First Amendment.  Rules or regulations that stifle speech based on the content of the message are the essence of what is proscribed by free speech jurisprudence.  See, e.g., Police Dept. v. Mosley, 408 U.S. 92 (1972); Kingsley Int'l Pictures Corp. v. Regents, 360 U.S. 684 (1959).  But as we recognize such basic freedoms, so too are we obliged to acknowledge the basic limits on our jurisdiction in the constitutional scheme.  When a case involving prospective relief provides a court with no factual assurance that future injury is likely and no clues about its contours should such an injury arise, we are left with only the faintest picture of a possible constitutional transgression occurring someday, somewhere in this country.  Such a claim is not fit for adjudication by this Court.

**AFFIRMED.**

24