[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-13178

_____

ALIEDA MARON,
LAWRENCE MARON,

                                        Plaintiffs-Appellants,

*versus*

CHIEF FINANCIAL OFFICER OF FLORIDA,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00255-RH-MAF

_____

Before BRASHER, ED CARNES, and WILSON, Circuit Judges.

BRASHER, Circuit Judge:

Under Florida's Disposition of Unclaimed Property Act, private property unclaimed for several years enters the State's custody, where it then accrues certain earnings that the State keeps and spends. The Marons—alleged owners of property held in Florida's custody—argue that the Act violates the Takings Clause of the Fifth Amendment by authorizing Florida to take their property without compensating them for the earnings. The district court dismissed the Marons' suit for failure to state a claim, reasoning that because the Act could have constitutionally escheated their property altogether, the State could keep custody of the property or return it without any compensation, let alone compensation for the property *and* earnings. On appeal, the parties dispute both the merits of the takings claim, and the district court's jurisdiction over it—specifically, whether the Marons had standing to bring their takings claim, whether the claim was ripe, and whether it was fully barred by sovereign immunity.

After careful review, we conclude that the district court had jurisdiction over the Marons' takings claim. But we cannot agree with the State's and district court's position on the merits. Accordingly, we vacate the court's judgment and remand for further litigation consistent with this opinion.

## I.

We set out the factual and procedural background below, based on the Marons' complaint and the text of the Act. Because the district court dismissed this case at the pleadings stage, we take the Marons' "well-pleaded allegations as true and draw all reasonable inferences in [their] favor." *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).

### A.

The Florida Disposition of Unclaimed Property Act governs Florida's management of unclaimed property. Fla. Stat. § 717.101 *et seq*. Under the Act, intangible property—*e.g.*, deposits, credit balances, stocks—held by a bank or other holder is "presumed unclaimed" after the property's owner fails to claim it within a few years, usually five, after it becomes payable. *See id*. §§ 717.102(1), 717.101(16), (18).

When property becomes "presumed unclaimed," the holder must deliver it to Florida's Department of Financial Services, which administers the Act. *Id*. §§ 717.101(10), 717.117(1), 717.119, 717.123. Generally, if the property is worth $10 or more, the holder must report to the Department the apparent owner's identifying information. *Id*. §§ 717.117(1)(a)–(b).

Upon receipt of the unclaimed property, Florida assumes "custody and responsibility for the safekeeping" of the property. *Id*. § 717.1201(1). Depending on the value and type of unclaimed property received, the Department must attempt to contact the

apparent owner. *Id.* §§ 717.118(1), (3). The Department then sells the unclaimed property or otherwise converts it into money unless the property delivered is money already. *See id.* §§ 717.121, 717.122.

The Department deposits these sale proceeds and all other funds received, into its "Unclaimed Property Trust Fund." *Id.* § 717.123. It then uses the fund to administer the Act and to pay claims brought by owners seeking to reclaim property in the Department's custody. *Id.* § 717.123(1). But except for the 2022–23 fiscal year, the trust fund has been capped at $15 million. *Id.* §§ 717.123(1), (3). So, the Department transfers funds in excess of the cap to Florida's interest-bearing State School Fund which, in turn, funds free public schools. *Id.* § 717.123(1); Fla. Const. art. IX, § 6. According to the Marons, Florida receives "more than $100 million in new unclaimed property every year" and "acknowledges that it holds over $3.5 billion of unclaimed property."

To retrieve property held in the Department's custody, owners may file a claim with the Department. Fla. Stat. § 717.124(1). If the Department approves the claim, it "shall deliver or pay over to the claimant the property or the amount the department actually received or the proceeds if it has been sold by the department, together with any additional amount required by" section 717.121. *Id.* § 717.124(4)(a). Section 717.121, in turn, entitles the owner to receive "any dividends, interest, or other increments" that accrued on the property when or before the property was sold or otherwise converted into money.

But—and most relevant here—the Act does not entitle the owner to earnings that accrue on the property *after* its sale or conversion into money, or to any earnings that accrue on in-custody property that is already money when received by the Department. *See id.* § 717.121. In other words, if the Department liquidated an owner's unclaimed property and generated interest by investing the resulting money in Florida's interest-bearing State School Fund, the owner would be unable to recover that interest when filing a claim with the Department.

### B.

Alieda Maron learned that she was entitled to unclaimed property that had been delivered to the Department—"premium refunds on individual" in the amount of $26.24, based on Florida's online records. Because the Act, as Maron alleged, precludes her from obtaining earnings that accrued on her refund after it entered Florida's custody, she filed a class action complaint against Jimmy Patronis, the former Chief Financial Officer of the State of Florida, in his official capacity (the "State"). The district court granted her leave to add her husband, Lawrence Maron, as another plaintiff.

The Marons' complaint alleged two counts. In Count I, the Marons sought declaratory and injunctive relief, asking the court to declare section 717.124(4)(a)—which they alleged prohibited payment of earnings that accrued on their property "while it was in the State's custody and being used for public purposes"—unconstitutional under the Takings Clause of the Fifth Amendment. The count stated that after the declaration, the Marons would seek "an

injunction requiring the State to pay" those earnings. Count II sought the same relief, but under Article X, Section 6(a) of the Florida Constitution. The State moved to dismiss the Marons' complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the Marons lacked standing, that sovereign immunity barred their claims, and that the Marons failed to state a claim for which relief could be granted.

The district court dismissed both counts—Count I with prejudice and Count II without. It concluded the following. First, the Marons had standing. Second, sovereign immunity barred their Count II state law claim, but barred Count I only to the extent it sought retrospective and not prospective relief. Third, the Marons failed to state a claim because "it is constitutionally sufficient for Florida to return the principal of the Marons' unclaimed property without interest or other compensation." In the court's view, it would have been constitutional for the Act to escheat the Marons' property altogether, so the State could take the lesser step of keeping the property in its custody (without transferring title) and then returning it without compensating for accrued earnings.

The Marons appealed only the dismissal of Count I. They argue the district court correctly held that they had standing to bring Count I and that the count was not fully barred by sovereign immunity, but erred in dismissing that count because it stated a Fifth Amendment takings claim. The State argues the court correctly dismissed Count I because the Marons lacked standing to

bring that claim, the claim was not ripe and was fully barred by sovereign immunity, and the Marons failed to state a takings claim.

## C.

We conclude the district court had subject matter jurisdiction over the Marons' takings claim—specifically, that the Marons had standing to bring Count I, that the count was ripe, and that it was not barred by sovereign immunity. But we reject the district court's counterfactual merits analysis, so we vacate and remand.

## II.

We start with jurisdiction. Although we have appellate jurisdiction, *see* 28 U.S.C. § 1291, the district court's subject matter jurisdiction is in dispute because standing, ripeness, and sovereign immunity—all of which the parties contest—are jurisdictional issues. *See Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006); *McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001). We review each question—whether the Marons had standing to bring their takings claim, whether the claim was ripe, and whether it was barred by sovereign immunity—*de novo*. *See Elend*, 471 F.3d at 1204; *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999). Because the State's motion to dismiss under Rule (12)(b)(6) challenged subject matter jurisdiction on the face of the Marons' complaint, we take the complaint's factual allegations to be true when assessing each question. *See McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251

(11th Cir. 2007); *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981). All three questions resolve in the Marons' favor.

### A.

To start, the Marons had standing to bring their Fifth Amendment takings claim. To have standing, a plaintiff "must have suffered [1] an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is [2] fairly traceable to the challenged conduct and [3] likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). "These requirements help ensure that the plaintiff has such a personal stake in the outcome of the controversy as to warrant [her] invocation of federal-court jurisdiction." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (internal marks omitted). The parties invoking federal jurisdiction—here, the Marons—bear the burden of establishing these elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Marons satisfied each one—injury in fact, traceability, and redressability. We take each element in turn.

### 1.

To allege an injury in fact, a plaintiff must allege that he has suffered (1) "an invasion of a legally protected interest" that is (2) "concrete," (3) "particularized," and (4) "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal marks omitted); *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996–97 (11th Cir. 2020). Here, the Marons

satisfied all four injury-in-fact requirements by alleging that Florida took their premium refund and used it.

Though the State argues that the Marons abandoned their property, we assume for purposes of standing that the Marons had a "legally protected interest" in the refund. We do so, because whether they have such an interest implicates the merits: a takings claim requires a plaintiff to "demonstrate that he possesses a property interest that is constitutionally protected." *Givens v. Alabama Dept of Corr.*, 381 F.3d 1064, 1066 (11th Cir. 2004) (internal marks omitted). When an attack on subject matter jurisdiction implicates an element of a cause of action, we treat the attack "as a direct attack on the merits of the plaintiff's case" and assume the element is satisfied for jurisdictional purposes. *See Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (internal marks omitted).

We turn to concreteness, particularization, and imminence. A concrete harm is "'real, and not abstract'"—the most obvious examples are physical and monetary harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–25 (2021) (quoting *Spokeo*, 578 U.S. at 340). A particularized injury "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (internal marks omitted). And an injury that is actual or imminent, not speculative, must have "already occurred or be likely to occur soon." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

The Marons satisfied these three elements, by alleging that the State took their refund and used it. They pointed to the Act's

requirement that presumed-unclaimed property be delivered to the State's custody, *see* Fla. Stat. § 717.119(1); they alleged that the State held their refund in its custody; and they alleged that the State "used the property for public purposes, including by investing the property and earning interest, and otherwise using it to fund the State's operations and programs." So the harm the Marons pleaded is concrete: they cannot use their refund now that it has been delivered into the State's custody—they must apply and be approved by the Department to access the property. *See* Fla. Stat. § 717.124(1). The pleaded harm is also particularized: the Marons cannot use *their* refund. And that harm is actual: the refund has *already* been placed into the State's custody, where it cannot be used by the Marons. In short, the Marons suffered an injury in fact.

Our injury-in-fact analysis is on all fours with the Supreme Court's decision in *Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180 (2019). Though *Knick* did not explicitly address standing, its discussion of *when* a plaintiff can bring a takings claim is instructive. In *Knick*, a private cemetery owner brought a Fifth Amendment takings claim in federal court after a town passed an ordinance requiring that all cemeteries be kept open to the public during daylight hours. *See id.* at 185–87. Overruling precedent, the Court held that the owner need not have first exhausted state law remedies to sue in federal court, because "[t]he Fifth Amendment right to full compensation arises *at the time of the taking*, regardless of post-taking remedies that may be available to the property owner." *Id.* at 190 (emphasis added). It made no difference that state law provided a "procedure that [could] subsequently result in just

compensation," because "it is the existence of the Fifth Amendment right that allows the owner to proceed directly to federal court under § 1983." *Id.* at 191. Even if a plaintiff later compensated by state law remedies would have no further claim, that would be "because the taking has been *remedied* by compensation, not because there was *no taking* in the first place." *Id.* at 195.

Like the cemetery owner in *Knick*, the Marons alleged that a taking already occurred. The "act of taking" is the "event which gives rise to the claim for compensation," *id.* at 190 (internal marks omitted), and the Marons alleged that act. They alleged that the State received their refund into its custody and so they can no longer readily use that property—and *that* is why they seek compensation for their refund and the earnings it accrued. Because a taking has already allegedly occurred, the Marons need not—contrary to the State's position—first file and be denied a claim with the Department to suffer an injury in fact. A procedure that can "subsequently result in just compensation" does not alter the fact that a taking has happened. *See id.* at 191, 195. So like in *Knick*, the Fifth Amendment allows the Marons "to proceed directly to federal court" to seek compensation. *Id.* at 191.

2.

The Marons alleged traceability too. To have standing, a plaintiff must allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 668–69 (2021) (internal marks omitted). Even harms that "flow indirectly" from challenged conduct "can be said to be fairly traceable

to that action for standing purposes." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1240 (11th Cir. 2023) (internal marks omitted). Here, the injury the Marons alleged—an inability to use the refund while it was in the Department's custody—flows from the challenged Act. It is *because* of the Act that the Department received the refund into its custody and used it for public purposes.

The State argues that there is no traceability because the Marons' lack of access to their refund stems from their failure to file a claim with the Department. But this argument misunderstands the injury. The Marons suffered an injury when Florida received the refund into its custody. The Marons' failure to file a claim with the Department did not *cause* Florida to take those actions. The Act did. And, even if the Marons' own failure to file a claim prolonged their lack of access to the refund, their contribution to their injury would not sever its causal connection to the Act. *Cf. Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.,* 148 F.3d 1231, 1247 (11th Cir. 1998) ("[S]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties.").

3.

Lastly, the Marons' injury is redressable. "Redressability is established . . . when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *S. River Watershed All., Inc. v. DeKalb County, Georgia*, 69 F.4th 809, 820 (11th Cir. 2023) (internal marks omitted). Here, a decision favorable to the

Marons—for instance, one declaring the Act is unconstitutional insofar as it precludes unclaimed-property owners from recovering certain accrued earnings—would redress the Marons' injury: such a decision would make it significantly more likely that the Marons receive what they argue is just compensation for the State's taking of the refund.

The State argues that even if a court so ruled, the Marons still may not receive the accrued earnings because they may ultimately fail to establish entitlement to the refund when they file a claim with the Department. But because the State brought a facial 12(b)(6) jurisdictional attack, and because whether the Marons owned the refund implicates the merits, their complaint's allegation that the refund was theirs is to be taken as true. And assuming the Marons owned the refund, a decision holding that it would be unconstitutional for the Act to preclude compensation for accrued earnings makes it more likely that the Marons will receive those earnings than if no such decision existed at all.

B.

Having concluded that the Marons had standing to bring their takings claim, we turn to—and reject—the State's argument that the claim was not ripe. The ripeness doctrine keeps courts from "engaging in speculation or wasting [our] resources through the review of potential or abstract disputes." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1257–58 (11th Cir. 2010). To that end, a claim is not ripe if it "rests upon contingent future events that may not occur

as anticipated, or indeed may not occur at all." *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010) (internal marks omitted).

To decide whether a claim is ripe, we examine (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Id.* The fitness prong concerns questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Harrell*, 608 F.3d at 1258 (internal marks omitted). The hardship prong "asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." *Id.*

Analyzing the two prongs, we conclude the Marons' takings claim was ripe. As an initial matter, the hardship prong favors the Marons. The longer judicial review is delayed, the longer the State holds the Marons' property without giving them what they alleged to be just compensation. *See id.*

The fitness prong favors the Marons too. The Marons alleged enough for the district court to assess if a taking occurred. They alleged that the State placed their $26.24 refund into its custody, and that it used the refund for public purposes including by investing the refund and funding the State's programs. The Marons may not be able to *prove* the factual content of these allegations—but that goes to the burden of proof, not ripeness. As explained above, a court takes as true their factual allegations for the purposes of analyzing a facial 12(b)(6) jurisdictional attack. *See McElmurray*, 501 F.3d at 1251.

Further, the Act already makes clear its measure of just compensation. That measure does not include earnings accrued on the property after the Department liquidates and invests it. Under the Act, "the department shall deliver or pay over to the claimant the property or the amount the department actually received or the proceeds if it has been sold by the department, together with any additional amount required by [section] 717.121"—and section 717.121 only entitles the owner to "any dividends, interest, or other increments realized or accruing on the property *at or before* liquidation or conversion thereof into money." Fla. Stat. §§ 717.124(4)(a), 717.121 (emphasis added). Section 717.121 clearly omits any earnings accruing on property *after* it is liquidated or otherwise converted into money.

Because the Act makes clear that those earnings will not be compensated, ripeness does not further require the Marons to file a claim with the Department for those earnings and be denied. We rejected a similarly pointless formality when we decided a ripeness issue in *Baughcum v. Jackson*, 92 F.4th 1024 (11th Cir. 2024). There, plaintiffs brought a pre-enforcement suit challenging the constitutionality of a state gun law that prohibited them from carrying firearms until they turned twenty-one. *See id.* at 1029. The defendants argued the plaintiffs' claims were not ripe because the plaintiffs had "never applied for a weapons license that was denied." *Id.* at 1037. We disagreed, reasoning that the plaintiffs need not first make such an application, because they already established that they were "able and ready to apply" but that applying "would be futile." *Id.*

So too here. Although the Marons have not yet filed a claim with the Department, it is apparent that they are "able and ready" to do so but that doing so "would be futile" with respect to the earnings they seek. *See id; see also Pakdel v. City & County of San Francisco, California*, 594 U.S. 474, 478 (2021) (finality in context of a regulatory taking was satisfied when plaintiff established there was "'no question'" about how the regulations applied to the land at issue). The Marons alleged that they plan to file a claim, and the Act makes clear that they will not be paid for earnings accrued on property liquidated or otherwise converted into money. Nothing is gained by further requiring the Marons to make and be denied a request with the Department.

The Marons' takings claim was ripe.

## C.

Our last jurisdictional inquiry concerns sovereign immunity. Because the Marons sued Florida's former CFO in his official capacity—thus suing the State—we assess whether sovereign immunity barred their claim. It did not.

Absent exceptions, sovereign immunity precludes federal courts from entertaining a private person's suit against a State. *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254 (2011). Under the exception in *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not bar suits against a State that seek "*prospective* equitable relief to end *continuing* violations of federal law." *Pryor*, 180 F.3d at 1336. To determine whether *Ex parte Young* applies, we conduct a "straightforward inquiry into whether [the]

complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (internal marks omitted).

That inquiry resolves in the Marons' favor. The Marons alleged an ongoing violation of federal law—that the State has appropriated their refund and failed to give them just compensation. And they sought prospective relief—that the district court declare a part of the Act unconstitutional for precluding recovery of just compensation and that it order the State to pay just compensation when they later file a claim. The *Ex parte Young* exception applies.

Relying on *Edelman v. Jordan*, 415 U.S. 651 (1974), the State argues that the Marons' prayer for injunctive relief is really a request for retrospective relief. The State contends that the request to "pay the Marons and class members past monetary gains *when* they file a claim in the *future* . . . amounts to nothing more than a prospective request for retroactive monetary damages." We disagree.

To start, *Edelman* is distinguishable. There, the plaintiffs alleged that Illinois state defendants had improperly processed applications for federal disability benefits, and a district court ordered "retroactive payment of benefits found to have been wrongfully withheld." *Id.* at 655–56, 678. The Supreme Court held that sovereign immunity barred this order, because it required "a form of compensation" for prior applications that were improperly processed, making the order effectively "an award of damages against

the State." *Id.* at 668. Here, the Marons did not ask for money that was wrongfully "withheld." *See id.* at 678. They did not contend that the Department wrongfully denied their claim for property and so must pay them damages for that wrongful denial: the Marons have not submitted a claim with the Department at all. Instead, through declaratory and injunctive relief, they requested that when they file a claim down the road, they be justly compensated.

Further, the difference at root between a takings claim and other constitutional claims makes clear that the Marons did not seek retroactive damages. Suppose an officer uses excessive force in violation of the Fourth Amendment and a court orders him to pay. In that scenario, the court would be ordering him to pay retrospective damages for a completed constitutional tort. *See e.g.*, *Slicker v. Jackson*, 215 F.3d 1225, 1230 (11th Cir. 2000) (explaining that if the plaintiff "prevail[ed] on his claim that the officers violated his constitutional rights," he could "receive compensatory damages" for "actual injuries" caused by the officers' illegal conduct). The constitutional tort occurred whether the payment is made or not, and the payment is recompense for the tort. Contrast that with the Takings Clause, which prohibits not takings, but takings *without just compensation*. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) ("[T]he Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power" (internal marks omitted)). The lack of compensation is a part of an ongoing tort.

In sum, sovereign immunity did not bar the Marons' takings claim because it sought not damages but prospective relief to end an ongoing violation of federal law. *See Pryor*, 180 F.3d at 1336.

### III.

Concluding that the district court had subject matter jurisdiction, we turn to the merits of the Marons' takings claim. The Marons have argued that the State took their property without just compensation because, although the State is willing to return the value of their property, it will not compensate them for the time the property is in state custody.

The Marons sought to plead a *per se* Fifth Amendment taking—one "in which the government directly appropriates private property for its own use." *Horne v. Dep't of Agric.*, 576 U.S. 350, 357–58 (2015) (internal marks omitted). *Compare with Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321–22 & n.17 (2002) (indicating that regulatory takings stem from laws that "prohibit a property owner from making certain uses of her private property"). Whether the Marons successfully pleaded a *per se* taking without just compensation turns on three inquiries: (1) whether the refund was their property when the State took custody; (2) whether the State directly appropriated that refund for the State's own use, *see Horne*, 576 U.S. at 357; and (3) whether the Act failed to provide just compensation by precluding the Marons from recovering any earnings on the refund post-conversion. *See Cerajeski v. Zoeller*, 735 F.3d 577 (7th Cir. 2013).

The State argues, and the district court held, that the takings claim fails at step one because the Marons "effectively abandoned" the refund before it entered the State's custody, so the State did not appropriate *their* property. To support its abandonment theory, the State points to the Supreme Court's decision in *Texaco, Inc. v. Short*, 454 U.S. 516 (1982). There, litigants brought a takings challenge against an Indiana law that automatically reverted mineral interests unused for twenty years to current surface owners of the property. *See id.* at 518, 530. The Court rejected the claim, reasoning that Indiana could treat a long unused and unclaimed mineral interest as abandoned and transfer title to a new owner. *See id.* at 525–30. As the Court explained, "after abandonment, the former owner retain[ed] no interest for which he [could] claim compensation." *Id.* at 530.

The State argues that, like the mineral owners in *Texaco*, the Marons failed to exercise dominion over the refund within the time prescribed by the Act and the Act constitutionally declared their refund to be abandoned. The State's argument, however, runs against the text of the Act—which expressly declines to transfer title over unclaimed property. The Act is not an escheatment statute. Instead, the Act provides that after an owner fails to claim property for a set number of years, the property is "presumed unclaimed." *See e.g.*, Fla. Stat. §§ 717.102(1), 717.105(1), 717.106(1), 717.113, 717.1101(1)(a). It does not say that property unclaimed for several years becomes abandoned or "presumed abandoned." And, after the unclaimed property is placed in the State's custody, the Act does not provide for a transfer of title, but merely gives the State

"custody and responsibility for the safekeeping of the property." *Id.* § 717.1201(1).

To be sure, two sections of the Act do declare property to be abandoned. Section 717.1382(1) covers federal savings bonds, and section 717.1071 covers demutualization, rehabilitation, or related reorganization proceeds. But neither of those sections covers the intangible property at issue here—an "insurance premium refund." And if anything, the fact that the Act declares a few types of property "abandoned" further suggests the Act does *not* mean "abandoned" when it says "presumed unclaimed." *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (discussing meaningful-variation canon of statutory interpretation).

For its part, the district court agreed with the State that the refund was "effectively abandoned." It concluded that, even if the Marons still had title to the refund when it entered the State's custody, the State could have constitutionally reworded the Act to transfer that title to the State, instead of leaving it with the Marons. And if the Marons had lacked title to the refund before it entered the State's custody, they would have lacked title to any of the earnings that accrued on the refund when it was in the State's custody.

There are two problems with this reasoning.

First, we cannot just assume that Florida could constitutionally escheat unclaimed property by simply rewording the Act—say, by changing the "presumed unclaimed" language to "presumed abandoned" and then effecting a transfer of title. True, states have traditionally carried the power to escheat abandoned personal

property. *See, e.g.*, *Delaware v. New York*, 507 U.S. 490, 497 (1993); *Anderson Nat. Bank v. Luckett*, 321 U.S. 233, 240 (1944). But when assessing whether an escheatment statute passes constitutional muster, courts must examine whether the statute gives the owner adequate notice and opportunity to be heard. *See Anderson*, 321 U.S. at 243–47; *see also Connecticut Mut. Life Ins. Co. v. Moore*, 333 U.S. 541, 542–44 & n.2, 547 (1948) (upholding New York escheat statute because it gave ample provision for notice and hearing, by requiring insurance corporations to advertise lists of abandoned property and permitting property claimants to file a claim with the comptroller). The State has not argued that this non-escheatment statute satisfies the due process requirements for escheatment, and the district court did not address that question.

Second, and more importantly, it does not logically follow that, because the Florida Legislature could enact a constitutional escheatment statute, the Act as written now is constitutional. The Supreme Court's analysis in *Horne*, 576 U.S. 350, makes this much clear. In *Horne*, raisin growers argued that the Takings Clause prohibited a federal statute from requiring that a portion of a grower's crop be reserved for the government free of charge. *Id.* at a 354, 356. The government argued it was "'strange'" for the growers to both challenge the reserve requirement and concede the government could altogether "'prohibit the sale of raisins without effecting a per se taking.'" *Id.* at 362. The Court reasoned, however, that even if a "physical taking of raisins and a regulatory limit on production may have the same economic *impact* on a grower," the Constitution "is concerned with means as well as ends." *Id.*

(emphasis added). A physical taking and a regulatory production limit were different means, the Court explained, and the means the government "use[d] to achieve its ends must be 'consis[tent] with the letter and spirit of the constitution.'" *Id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819)). Here, taking custody of one's "presumed unclaimed" property is different from declaring that property to be abandoned and then transferring that property's title—even if both scenarios might eventually lead to the same end result.

For these reasons, we vacate the district court's judgment, and remand for further proceedings. The parties may wish to focus on the three inquiries we noted above: (1) whether the refund was the Marons' property—that is, whether they in fact abandoned their refund before or when it entered the State's custody—and, if the Act itself effectuated an abandonment of property, whether the Act did so constitutionally; (2) whether the State "directly appropriate[d]" that refund "for its own use," *id.* at 357; and (3) if the State appropriated the Marons' private property for the State's own use, whether the Act fails to provide just compensation.

Nothing in our ruling prohibits additional proceedings on other inquiries after this case is remanded to the district court.

## IV.

We vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**